Alicia **MORALES**, et al.,

v.

James A. **TURMAN**, Individually and in his official capacity as Executive Director of the Texas Youth Council, et al.

v.

**UNITED STATES** of America, Amicus Curiae,

American Orthopsychiatric Association et al., Amici Curiae.

Civ. A. No. 1948.

United States District Court,
E. D. Texas,
Sherman Division.

Aug. 30, 1974.

See also, D.C., 326 F.Supp. 677; 59 F.R.D. 157; 364 F.Supp. 166.

Peter B. Sandmann, San Francisco, Cal., Steven L. Bercu, Richardson, Tex., William P. Hoffman, Jr., Washington, D. C., for plaintiffs.

John L. Hill, Atty. Gen. of Texas, Tex., Larry York, Joe B. Dibrell, Jr., Max P. Flusche, Jr., and Thomas W. Choate, Asst. Attys. Gen., Austin, Tex., Robert F. Salter, Staff Atty., Gatesville, for defendants.

Louis M. Thrasher, Michael Lottman, William Malcolm Logan, Jr., Daniel E. Maeso and Michelle White, Attys., Civil Rights Div., Dept. of Justice, for amicus curiae, United States of America, Larry A. Schwartz, Patricia M. Wald, for amici curiae, American Orthropsychiatric Association, et al.

## MEMORANDUM OPINION AND ORDER

JUSTICE, District Judge.

### I. INTRODUCTION

*If any parents shall wilfullie and unreasonably deny any childe timely or convenient marriage, or shall exercise any unnatural severitie towards them, Such children shall have free libertie to Complain to Authoritie for redresse.* Massachusetts Body of Liberties, 1641, No. 83: "Liberties of Children." (Italics added.)

*While there can be no doubt of the original laudable purpose of juvenile courts, studies and critiques in recent years raise serious questions as to* *whether actual performance measures well enough against theoretical purpose to make tolerable the immunity of the process from the reach of constitutional guarantees applicable to adults. . . . There is evidence, in fact, that there may be grounds for concern that the child receives the worst of both worlds: that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children.* Kent v. United States, 383 U.S. 541, 555–556, 86 S.Ct. 1045, 1054, 16 L.Ed.2d 84 (1966). (Italics added.)

This civil action concerns both the adjudicatory and post-adjudicatory stages of the juvenile justice system in the State of Texas. The plaintiffs are minor children who represent a class consisting of all juveniles who are presently, have been in the past, or may be in the future adjudicated delinquent [1] and involuntarily committed to the custody of the Texas Youth Council (hereinafter called the TYC).[2] Defendants are Dr. James A. Turman, Executive Director of the TYC, members of the TYC (appointed by the Governor of Texas with the consent of the Senate), and various employees of the TYC responsible for supervision of the juveniles committed to TYC custody.[3]

### A. *Description of TYC System*

The TYC has six training schools, three for girls and three for boys. The boys' schools are: Giddings State Home and School for Boys (maximum capacity 480 boys); Gatesville State School for Boys (a complex of seven schools with a total maximum capacity of 1,560 boys); and the Mountain View State School for Boys (maximum capacity of 480).

1. Vernon's Tex.Rev.Civ.Stat.Ann. art. 2338–1.

2. Tex.Rev.Civ.Stat.Ann. art. 5143d.

3. The members of the TYC at the time this civil action was brought and at the time of trial were Robert W. Kneebone, Louis M. Henna and W. Forrest Smith. (Kneebone and Henna have since been replaced by Patricia Ayres and Donald Workman.) James A. Turman was the Executive Director of the Texas Youth Council at the time this action was instituted and at the time of trial. (He has since been replaced by Ronald Jackson.)

The girls' schools are: Brownwood State Home and School for Girls (maximum capacity 240 girls); the Crockett State School for Girls (maximum capacity 209 girls); and the Gainesville State School for Girls (maximum capacity 390 girls).[4]

The seven subschools of Gatesville are: Valley, Hackberry, Riverside, Terrace, Hilltop, Live Oak, and Sycamore. At the time the trial of this civil action began, the population of Gatesville School was 1,149; Mountain View, 361; Brownwood, 109; Crockett, 126; and Gainesville, 220. In fiscal year 1972, sixty percent of the males admitted to TYC institutions were committed for crimes of stealing, nine per cent for crimes of violence, nineteen per cent for disobedience and immoral conduct, and sixteen per cent for other reasons. Of the females admitted to TYC institutions, fifteen per cent were committed for crimes of stealing, four per cent for crimes of violence, sixty-eight per cent for disobedience and immoral conduct, and thirteen per cent for other reasons.

As of May, 1973, the ethnic composition of the TYC Central Office was eighty-four and three-tenths per cent Anglo, eight and six-tenths per cent Mexican American, and seven and one-tenth per cent Black. All but one of the Blacks and one of the Mexican Americans are parole officers.

Seven of the 254 Texas counties accounted for fifty per cent of the TYC admissions in fiscal 1972. In the same year, eighty per cent of the admissions to TYC were boys, and twenty per cent were girls. The ethnic backgrounds of the youths incarcerated in the TYC are as follows: Anglo, forty-three and two-tenths per cent; Mexican American, twenty-four and three-tenths per cent; and Black, thirty-two and four-tenths per cent. The average length of stay of juveniles in various TYC institutions is as follows:

| | Median | Longest |
|---|---|---|
| Crockett | 12.3 mos. | 38 mos. |
| Gainesville | 12.4 mos. | 29 mos. |
| Brownwood | 12.0 mos. | 21 mos. |
| Gatesville | 10.0 mos. | 26 mos. |
| Mountain View | 18.8 mos. | 30 mos. |

### B. *Outline of the Opinion*

The genesis of this civil action was hardly dramatic. More than three years ago, this court granted a preliminary injunction sought by two young attorneys who were attempting to confer privately with their clients and communicate with them by uncensored mail. The extensive litigation outlined in this memorandum opinion has been the outgrowth. The first portion of the opinion relates to challenges to the jurisdiction of this court, traces the early history of the case, and discusses the juvenile's right to counsel and access to the courts. The second section concerns the widespread abuse of procedural due process for juveniles in the adjudicatory stage, and includes an agreed judgment entered in an attempt to correct this abuse. The final part of the opinion concerns plaintiffs' allegations regarding cruel and unusual punishment and the so-called right to treatment. A preliminary injunction in regard to some of the matters discussed in the final portion of this opinion was entered on August 31, 1973.[5]

## II. ELEVENTH AMENDMENT

The defendants' contention that this civil action is barred by the eleventh amendment to the Constitution borders on the frivolous; it is discussed here only because the defendants advance it with apparent seriousness. They argue, in essence, that execution of the relief

---

4. The named schools are also referred to as Giddings, Gatesville, Mountain View, Brownwood, Crockett and Gainesville.

5. Morales v. Turman, 364 F.Supp. 166 (E.D. Tex.1973) (hereinafter the emergency inter-

im relief order), cited by the Fifth Circuit in Donaldson v. O'Connor, 493 F.2d 507, 534 n. 32 (5th Cir. 1974) and by the Seventh Circuit in Nelson v. Heyne, 491 F.2d 352 (7th Cir. 1974), cert. denied, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974):

requested by the plaintiffs, the United States, and the *amici* will necessitate the expenditure of state funds and thus constitute, in their words, a "raid on the treasury" of the state. Initially, it is noted that there is little or no evidence in the record to support the contention that any relief ordered by this court will be more costly than the maintenance of present conditions in the Texas Youth Council institutions. Indeed, there is some evidence that implementation of some of the kinds of requested relief—in particular the placing of more children in community facilities and fewer in residential institutions—would save the state a considerable sum. Yet it is not necessary for the court to make a finding with respect to the relative costs of various plans and compute whether the state may be put to an additional expense in complying with the court's order. The Supreme Court has spoken on the subject very recently in Edelman v. Jordan, (1974) 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662:

> ■ The injunction issued in *Ex parte Young* was not totally without effect on the State's revenues, since the state law which the Attorney General was enjoined from enforcing provided substantial monetary penalties against railroads which did not conform to its provisions. Later cases from this Court have authorized equitable relief which has probably had greater impact on state treasuries than did that awarded in *Ex parte Young*. In Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed. 2d 534 (1971), Arizona and Pennsylvania welfare officials were prohibited from denying welfare benefits to otherwise qualified recipients who were aliens. In Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), New York City welfare officials were enjoined from following New York State procedures which authorized the termination of benefits paid to welfare recipients without prior hearing. But the fiscal consequences to state treasuries in these cases were the necessary result of compliance with decrees which by their terms were prospective in nature. State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct. Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in Ex parte Young. . . .

*Id.* at 665, 94 S.Ct. at 1357.

Consequently, even if compliance with the court's order requires the expenditure of state funds that might not ordinarily be allocated for Texas Youth Council purposes, the eleventh amendment constitutes no obstacle. Were it otherwise, "a great number of federal district court judgments are void, and the Supreme Court has affirmed many of these void judgments." Gaither v. Sterrett, 346 F.Supp. 1095, 1099 (N.E. Ind.), aff'd 409 U.S. 809, 93 S.Ct. 68, 34 L.Ed.2d 70 (1972).

## III. NECESSITY FOR A THREE-JUDGE COURT

During the week before the trial of this case, the defendants made their first motion for the convening of a three-judge district court pursuant to 28 U.S.C. § 2281 (1970). The motion was denied by an order of July 20, 1973. In the same order, certain issues were severed (*i.e.*, challenges to compulsory religious services and involuntary work practices) from the remaining issues in the case, and no relief is granted in respect to these issues. In their post-trial submissions, however, the defendants have renewed their arguments to the effect that a single judge cannot lawfully take any action in this case. In light of their renewed contentions and recent pronouncements by the appellate courts, the court here takes the opportunity to consider the issue anew.

The Three-Judge Court Act is, as the Fifth Circuit has recently noted,

phrased in "deceptively simple language." Sands v. Wainwright, 491 F.2d 417 (5th Cir. 1973):

> An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title.

28 U.S.C. § 2281 (1970). That two of the essential elements designated by the statute—the prayer for an injunction and presence of a state officer as party defendant—are present in this case is not in controversy. The plaintiffs, the United States, and the other *amici* all contend, however, that the two other requirements are absent from this case: they argue (1) that they do not challenge a state enactment of state-wide application, and (2) that they do not seek a ruling that any statute or order is unconstitutional.

The only state *statutes* that could conceivably be involved in this litigation (excluding those statutes consideration of which was severed by the court's order prior to trial) are the general "enabling statutes" for the Texas Youth Council. These statutes, however, are only very general grants of authority to the TYC. Moreover, the plaintiffs certainly have no quarrel with the statutes, since it is upon the language found therein that they rely in their argument that juveniles have a statutory "right to treatment." *See* Tex.Rev.Civ.Stat.Ann. art. 5143d (1971). ("The purpose of this Act is to create a Texas Youth Council . . . to provide a program of constructive training aimed at rehabilitation and reestablishment in society of children adjudged delinquent . . . .") It is obvious that plaintiffs are not attempting to challenge the constitutionality of those statutes, whether as written or as applied, since they seek in this action to compel the defendants to comply with the statutory mandate by actually providing rehabilitative care and treatment.

The defendants, however, have strenuously urged the similarity of the instant case to the case of Baker v. Estelle, sub nom. Sands v. Wainwright, 491 F.2d 417 (5th Cir. 1973). In *Baker,* the Fifth Circuit remanded for consideration by a three-judge court a civil rights case brought by a prisoner. The plaintiff therein challenged the constitutionality of two procedures followed in Texas Department of Corrections institutions—disciplinary procedures (related to the loss of good time and commitment to solitary confinement) and censorship of attorney-inmate correspondence. The plaintiff appellee argued before the Fifth Circuit that a three-judge court was not necessary, because his constitutional challenge was directed to *practices* rather than to *regulations.* That court disagreed with him, stating that:

> No party has contended that Texas prison officials are acting outside the scope of their statutory authority in carrying on these allegedly unconstitutional practices. The "practices" whose enforcement the inmates seek to enjoin are, in reality, the Rules and Regulations of the Texas Department of Corrections, *as applied.*

491 F.2d at 428. Of course, as noted above, the plaintiffs herein *do* contend that the defendants are in violation of their statutory authority. Yet the more central weakness in the defendants' argument, and the distinction between the present case and *Baker,* lies in the ephemeral, mythical, and indeed, almost non-existent character of the central policy of the Texas Youth Council. There are no "Rules and Regulations" that apply to all of the institutions under the authority of the TYC, as there were for the Texas Department of Corrections in *Baker.* The court has repeatedly invited the defendants to point to some body of

central regulations that govern the conduct of *all* of the institutions of the TYC. The following colloquy took place between the court and counsel for the defendants at oral argument of their motion for a three-judge court:

BY THE COURT

Q Specifically, what regulations of state-wide application are here involved?

A Now if the court is asking the additional question to point those out in the minutes [of the meetings of the Texas Youth Council]—is that what is being asked?

Q Yes.

A Not able really to point out—we have studied them to some degree with that in mind. I cannot point out to the court specifically the . . .

The only evidence even alluded to by the state that suggests a central policy of the Texas Youth Council is the "minutes" mentioned by the defendants' counsel in the above exchange. These are records of the meetings of the three-member Board of the Texas Youth Council. There is apparently no stenographer who makes a verbatim transcript of the meetings, because the Executive Director of the TYC testified in his deposition that "any one of a number of people can take the minutes." The minutes are bound in a volume which is not codified, indexed by subject, or updated —it is simply a chronological compendium of summaries of all TYC meetings since 1949 or before. Dr. Turman testified that for a superintendent of an institution to have an adequate knowledge of TYC central policy, it would be necessary that he read all of the minutes as far back as 1949, and be familiar as well with "what special directives apply and what opinions of the Attorney General apply and what orders from the legislative budget office, the Board of Control, the Legislative Audit Committee, and the State Auditor apply." The "minutes" are not circulated to the treatment staff generally—the teachers, correctional officers, houseparents, and casework-

ers—but sent only to the superintendent and business manager of each institution.

The court has carefully inspected the compendium of the TYC minutes from 1957 to 1972 and has found nothing there but the most general discussion of issues. Much of the recorded discussion concerns budget planning, building and construction projects, public relations, and other matters only tenuously related to the task of rehabilitating individual children. It is thus wholly impossible to construe the minutes as "rules and regulations." Compare Dorado v. Kerr, 454 F.2d 892 (9th Cir. 1972) with Nieves v. Oswald, 477 F.2d 1109 (2d Cir. 1973). In the words of the Supreme Court, these fleeting notations do not "partake of the quality and dignity of those state statutes or policies that three-judge courts were designed to consider." Board of Regents v. New Left Education Project, 404 U.S. 541, 545, 92 S.Ct. 652, 655, 30 L.Ed.2d 697 (1972).

Indeed, one of the bases of the plaintiffs' challenge to the conditions in TYC institutions is the very evident absence of any central leadership, direction or planning for the Youth Council. Practically every decision related to employment, treatment, education, discipline, institutional life, and allocation of resources in an institution is left to the superintendent of that institution (who may, in turn, delegate the decision, intentionally or by default, to an even lower-echelon staff member). The defendants, in fact, *stipulated* that:

Policies of the TYC are set forth in the minutes of council meetings, special policy directives and the Council's publication "Administrative Organization of the Texas Youth Council," Attorney General's Opinions; General Appropriations bills and riders thereto; special directives received from the State Comptroller, the State Auditor, the Texas Education Agency, and the State Board of Control have the force and effect of policy directives received directly from the TYC. Specific policy directives may be commu-

nicated to staff either by memorandum or by word of mouth.

Superintendents of Training Schools in the TYC system exercise wide discretion in formulating the programs, services and ground rules in their respective schools. The program may vary with respect to inspection of mail, furloughs, visiting, disciplinary policies, and in the amount and type of off-campus freedom permitted for students. Superintendents, with assistance from department heads, select for employment the personnel of their respective institutions. As an example of the quality of guidance emanating from the TYC Central Office, Dr. Turman testified in his deposition as follows:

Q Returning for a moment to the Security Treatment Cottage at Mountain View, Dr. Turman, are you aware of what the policy in the Special Treatment Cottage there is in regard to family visitation?

A Yes.

. . . . . .

A It depends on a number of things, and this would be determined by the superintendent at the time of the visit.

Q What kinds of factors would he take into consideration?

A Whatever factors he considered important at that time.

Q Are you aware of any factors that he would consider to be important?

A Well, there are many.

Q Can you give me an example of factors that a superintendent should take into consideration in determining how long a boy should see his family when he is in STC?

A Well, I'd leave that up to his judgment.

Q That's up to his discretion entirely?

A Yes.

. . . . . .

Q So that you have never, for example, sent any policy directives to the superintendent of Mountain View as to the visitation length of a child in STC?

A Not that I recall.

A study of the factual portion of this opinion will reveal, as one might expect after reading the above, vast *differences* between the various institutions run by the TYC. Some of the institutions—homes for dependent and neglected children—were not even the subject of this lawsuit. Others—for instance, the Brownwood State Home and School for Girls—have been treated by the plaintiffs, the United States, and the *amici*, as more adequate facilities, the very existence of which demonstrates that the deficiencies of the remaining institutions need not continue unabated.

To the extent that there are written policies in the TYC institutions, such as manuals for employees or students, they are written for one institution only and are distributed to the staff and inmates of that institution alone. There are often major differences between the rules of the various institutions. *See* Board of Regents v. New Left Education Project, *supra*. Furthermore, the rules that govern institutional life in TYC institutions may vary from dormitory to dormitory or cottage to cottage *within the same institution*. Thus, some "dorm men" at Gatesville allow boys to smoke, others never allow smoking, and still others permit it or not as their whims dictate. Such illustrations could be listed at length. That all of these practices may be *consistent* with some nebulous policy certainly does not imply that a challenge to the practices is necessarily a challenge to the policy. In fact, almost *any* action, however arbitrary, by an employee short of physical abuse of a child is probably *consistent* with TYC "policy," because that "policy" is so vague as to be non-existent.

█ In summary, the only enactments of state-wide application that the defendants suggest are challenged herein

constitute the enabling statutes of the Texas Youth Council and TYC central "policy" as embodied in the minutes of the TYC Board meetings. With respect to the statutory provisions, the plaintiffs do not challenge, but seek to invoke them, for they claim that the actions of which they complain are inconsistent with the statute. TYC "policy," as embodied in the minutes, is close to undiscoverable and does not constitute a coherent body of regulations that are applied throughout the system; such rules and regulations as exist are local to single institutions or even subdivisions thereof. For all of these reasons, the court reaffirms its earlier ruling that a three-judge court, pursuant to 28 U.S.C. § 2281, is neither the necessary nor the appropriate forum for the consideration and determination of this case.

## IV. RIGHT TO COUNSEL AND ACCESS TO THE COURTS

In January 1971, Steven Bercu, Esq., an attorney associated with the El Paso Legal Assistance Society in El Paso, Texas, was retained to represent Johnny W. Brown, a minor child then incarcerated in one of the institutions under the jurisdiction of the Texas Youth Council. In connection with a habeas corpus petition filed on behalf of Brown in the Juvenile Court of El Paso County, Bercu obtained a discovery order permitting him to interview a number of other TYC inmates who had been committed by order of the juvenile court. Bercu sought the discovery order, which permitted him "to interview and depose and take affidavits from" eighteen inmates of the TYC, after learning that Brown and other minor children might have been committed to the TYC by the juvenile court without a court hearing or any other requisites of due process.

Roland Daniel Green, III, Esq., was an Assistant Attorney General for the State of Texas between September 1, 1967, and November 16, 1972. One of his duties was to give legal advice to the TYC and its employees and to represent that agency in court. By January 1971,

Green not only was aware of two applications for the writ of habeas corpus (one on behalf of Brown) filed by Bercu in El Paso, but also knew that the newspaper and television media had initiated certain investigations into the activities of TYC. When he learned of the discovery order issued in the Brown case, Green contacted Dr. James A. Turman, Executive Director of TYC, so that, in Green's words, "the Youth Council could be on the lookout for Mr. Bercu."

On January 27, 1971, Bercu and William Hoffman, Jr., Esq., an attorney associated with the Youth Law Center of San Francisco, California, arrived at the Gainesville State School for Girls, for the purpose of interviewing the six girls named in the discovery order. When notified of Bercu's and Hoffman's appearance, Green conversed by telephone with Turman, Bercu, and Thomas Riddle, the school superintendent. In the course of the conversations, Green attempted to persuade Bercu to interview the six girls in the presence of Riddle. Bercu refused this condition and insisted that he was entitled to interview the girls privately. Ultimately, Green, who claims that he knew of no attorney-client relationship between Bercu and the children, advised Turman and Riddle that it was within their discretion to require a supervisor's presence during any interviews.

Each of the six minors Bercu and Hoffman interviewed stated that she had received no hearing whatever before the Juvenile Court of El Paso County in connection with her adjudication and commitment to the TYC. The attorneys thereupon informed the girls that federal constitutional requirements, established by the United States Supreme Court, provide certain safeguards for juvenile court proceedings, and that minors incarcerated in disregard of these provisions might well be successful in seeking relief by way of habeas corpus. After receipt of this advice, the six girls requested legal representation by Bercu and Hoffman. As a result of these interviews, which continued through Janu-

ary 28, 1971, Bercu and Hoffman obtained written authorizations to represent the six girls. Copies of these agreements were left with Riddle.

On January 29 and 30, 1971, Bercu and Hoffman conducted similar interviews with six minor children in the Gatesville State School for Boys and in the Brownwood State Home and School for Girls. Like the interviews at Gainesville, which were conducted in the presence of Riddle, the interviews at Gatesville and Brownwood were in the presence of the respective school superintendents.

On February 10, 1971, nearly two weeks after their first visit to Gainesville State School for Girls, Bercu and Hoffman returned to Gainesville to confer with their clients regarding the preparation of habeas corpus petitions in the juveniles' behalf. They brought with them sufficient affidavit forms to support actions *in forma pauperis* and other documents necessary to file habeas corpus actions for their clients in the District Court of El Paso County, Texas. Upon the arrival of Bercu and Hoffman at Gainesville, Riddle notified Green by telephone that Bercu was again objecting to the presence of a supervisor during his interviews with the girls. Green once more attempted to persuade Bercu to accept this procedure, maintaining that TYC policy required the presence of a supervisor during the interviews. (Following the first hearing in this court, however, Green admitted that his interpretation of the policy was erroneous.)

Green then discussed the situation with Turman, who upheld Riddle's position.[6] Turman detailed his purported reasons for requiring the presence of a

supervisor during the interview which were as follows: concern about solicitation of clients, concern that the children's families knew of no relationship between their children and an attorney, the possibility that NBC television might be involved, concern that the children might be obtaining drugs, and a general concern for the welfare of the children.

Following his discussion with Turman regarding the reasons for requiring the presence of a supervisor during the interviews, Green talked with Robert Flowers, Esq., the Chief of the Enforcement Division of the Office of the Attorney General of the State of Texas. Flowers authorized Green to call Riddle by telephone and inform him that he, Riddle, should be present during the interviews. Green also informed Riddle in the subsequent telephone conversation that "our office would support Turman and him [Riddle]."

On February 11, 1971, Bercu and Hoffman sought the assistance of the Chairman and Vice-Chairman of the Youth Affairs Committee of the Texas Senate in seeking to interview their clients without interference; but the Senators were unsuccessful in reaching Turman. On the following day, Bercu and Hoffman, on behalf of the twelve children who had retained them as counsel, filed this civil action in the Sherman Division of the Eastern District of Texas. On February 16, 1971, plaintiffs filed a motion for preliminary injunction, seeking to enjoin the TYC and their agents from interfering with the children's right to confer privately with counsel and from impeding in any manner their correspondence with counsel through the mail.

6. Turman, who has held his position as Executive Director of the TYC since September 1, 1957, describes his responsibility as that of carrying out all general and specific statutes relating to the administration of the TYC, including the care, treatment, education, training, and re-establishment in society of all children committed to the TYC by the courts of the State of Texas. He further describes his responsibility as that of carrying out the policies promulgated by the three-member citizen board appointed by the Governor to direct the activities of the TYC, and the specific directives received from the Legislature, the State Comptroller, State Auditor, and the Attorney General through his opinions.

At the subsequent hearings, it became evident that TYC policy regarding inmate interviews with attorneys was unclear. Riddle testified at one point that he understood TYC policy to require a representative of the TYC to be present during an inmate-attorney interview; but at another point, under questioning from the court, he admitted that he was unsure of TYC policy.[7]

Turman, on the other hand, testified that the Attorney General of the State of Texas determined whether or not an attorney-client relationship existed between TYC inmates and attorneys, and that if Turman were in doubt he would simply contact the Attorney General. It appears that Green did tell Turman that he thought that solicitation by Bercu and Hoffman had occurred. Yet Turman made no determination on or before February 10, 1971, that the attorney-client agreements between Bercu and the children were invalid, nor did Turman seek to determine whether or not Bercu and Hoffman were members of the State Bar of Texas on or before that date.

Both Turman and Riddle admitted that TYC policy included the censorship of both incoming and outgoing mail to all persons, including attorneys and judges. Although Riddle stated that he did not ordinarily make copies of letters sent to inmates, he did make copies of two letters sent to plaintiffs' attorneys by two girls, a Miss Jorgenson and a Miss Arnold. Riddle testified that he was not sure why he needed copies of these two letters;[8] but he stated that censorship of the incoming mail was necessary to prevent correspondence relating to escape plans and to prevent passage of drugs. Possible communication regarding escape plans was also given as a justification for censorship of outgoing mail.

After a hearing on the motion for preliminary injunction, an order was entered by this court which found that each of the twelve named plaintiffs had entered into a valid attorney-client relationship with Bercu and Hoffman, and which enjoined the TYC and their agents from (1) interfering with the rights of the children to confer privately with counsel and (2) from impeding in any manner their correspondence through the mail with their attorneys.[9] In response to a subsequent motion for clarification of this order, the court slightly modified and supplemented the original order, so as to enjoin the agents of TYC from any harassment or intimidation of the persons seeking to exercise their rights under this order.

The preliminary injunction regarding communication of TYC inmates with their attorneys was extended to a permanent injunction regarding mail censorship generally in the emergency interim relief order entered in the third phase of this action. In the conclusions

---

7. THE COURT: My question to you is, what has been the policy of the Youth Council with reference to interviews between attorneys—assuming that they are legal attorneys—and the inmates? Are they conducted in privacy?
 THE WITNESS: Since I have been superintendent, I don't believe we have had any. We have had bench warrants when the children went home.
 THE COURT: But no one has come to the institution that represented—?
 THE WITNESS: Since I have been superintendent—before I was superintendent I think there was one, but since I have been superintendent I don't remember any attorneys that came to my knowledge now.
 THE COURT: Well, with reference to the one attorney that came, that had been there, did he talk privately with the girl, or was the interview conducted—?
 THE WITNESS: This I would have no knowledge of. I suppose he did. I don't know. I just know that he had a relation with the girl.

8. "Well, personally the reason I thought it was copied, that we wanted a copy, because we didn't know whether or not there had been an attorney-client relationship established. Therefore, if you were not on the approved list, and you were not their attorney, well, then this puts me in a precarious situation that I needed to know what the correspondence was, and I needed a copy of it, and this was the advice I received."

9. Morales v. Turman, 326 F.Supp. 677, 680 (E.D.Tex.1971).

of law accompanying that order, it was stated that:

Although this limitation on permissible censorship of the mail of adult prisoners remains uncertain, it is clear that any restrictions upon the important first amendment freedom of communication must bear, at the very least, a rational relationship to the advancement of a legitimate state interest. . . . The defendants have advanced no legitimate state interest, much less a compelling interest, that is served by the reading or censoring of incoming or outgoing mail, or by limitation of the persons with whom inmates may correspond. A legitimate state interest in preventing the flow of contraband into Texas Youth Council institutions justifies only the least restrictive practices adequate to achieve that interest—in this case, the opening of incoming mail in the presence of the inmate to whom it is addressed for the sole purpose of examining it for contraband.

364 F.Supp. 166, 174 (E.D.Tex.1973). Approximately eight months after this court's decision, the Supreme Court decided Procunier v. Martinez, 414 U.S. 973, 94 S.Ct. 264, 38 L.Ed.2d 216 (1974). *Martinez* concerned, *inter alia,* the question of censorship of adult prisoners' mail. Although confronted with arguments addressed to the prisoners' first amendment rights regarding mail communication, the Court chose to decide the case on what it concluded was the narrower issue of the non-prisoner's first amendment rights to correspond with the prisoner. Under this analysis, it was concluded that censorship of adult prisoner mail is justified if two criteria are satisfied. First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Secondly, the limitation of first amendment freedom must be no greater than is necessary or essential to the protection of the particular governmental interest involved. The court identified the governmental interests at stake in the adult prison area as the preservation of internal order and discipline, maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners.

After a reconsideration of the evidence in the instant action in the light of the standards advanced by the Supreme Court for deciding whether specific regulations or practices constitute an impermissible restraint on the first amendment liberties of non-prisoner correspondents, this court is not persuaded that its conclusion should be modified. Indeed, two considerations undercut considerably any argument contending that the governmental interests asserted here in earlier stages of this action justify the interference with mail beyond that permitted by this court in its emergency relief order. First, TYC no longer imposes any censorship requirements on outgoing mail. Secondly, several TYC school superintendents testified that they no longer impose any such restrictions on incoming mail, and that the apprehension regarding a flurry of escape plans has proved to be unjustified.

With respect to plaintiffs' claim regarding the right of inmates to confer privately with counsel, it should be observed that, although the right to counsel is fundamental, the state is not without some rights to make reasonable rules and regulations regarding access of inmates to attorneys. One influential court has stated: "The state has a legitimate interest in protecting juveniles under detention from visits by attorneys (or persons asserting themselves to be such) whom the juveniles have expressed no desire to see and who have not established authority to speak for them." Negron v. Wallace, 436 F.2d 1139, 1144 (2nd Cir. 1971) (Friendly, J.). A review of the record before this court at this time is not persuasive that the views stated by certain TYC and Attorney General personnel in the episode complained of by the plaintiffs represent a policy promulgated by the TYC. Thus, any further relief regarding a

TYC "policy" must necessarily await a better record.

■■■ Since the defendants are now not without some guidelines in this area, see Negron v. Wallace, *supra* at 1144–1145, the court does not anticipate that future adjudication will be necessary. Any policy adopted by TYC must necessarily conform to the constitutional requisites. Hence, the detained juvenile has a constitutional right to consult with his or her attorney in privacy, undisturbed in any manner by supervising personnel. The state has the right, on the other hand, to impose certain reasonable regulations, in the absence of an emergency.[10] Any of these regulations must, however, be subject to the caveat that inmates cannot be denied access to an attorney either by telephone or otherwise at any time that a legitimate emergency arises. Moreover, state personnel who have received some assurance that the person purporting to be an attorney is, in fact, a licensed attorney but who still harbor some concern regarding ethical matters such as solicitation, or any other such problem, should properly share this concern with the appropriate state bar grievance committee and this court.

■■■ The final matter concerns plaintiffs' claim for damages against Turman and Green under 42 U.S.C.A. Sec. 1983. With respect to the claim against Green, it is concluded that Green, as the Assistant Attorney General charged with rendering legal advice to members and employees of the Texas Youth Council, was acting within the scope of his authority at all times when he advised TYC personnel, and that he therefore is immune from suit under Sec. 1983 as a "quasi-judicial officer." E. g., Guerrero v. Barlow, 494 F.2d 1190 (5th Cir. 1974). With respect to the claim against Turman, this court concludes that, since it is undenied that Turman was at all times acting pursuant to the advice of Green, Turman should not be held liable.

## V. PROCEDURAL DUE PROCESS

Following extensive discovery efforts and lengthy negotiations regarding allegations of the denial of procedural due process to juveniles in the adjudicatory stage, the parties were able to agree to certain findings of fact, which are set out in a footnote.[11]

On December 27, 1972, this court entered an agreed order, which is also shown in a footnote.[12]

---

10. It may, for example, require the attorney to present some evidence of his license to practice, such as a state bar membership card; it may require advance notice of an appointment; or it may impose reasonable restrictions on access to the telephone to contact an attorney.

11. (1) Prior to the filing of this action, a Texas juvenile court judge entered orders adjudicating the delinquency and directing the incarceration of all original, named plaintiffs in this action, all of whom were then minor children; these plaintiffs had never appeared in court or before a judge nor had they been represented by or consulted with an attorney in connection with his or her adjudication as a delinquent child.

(2) On various dates between January 1, 1967, and March 30, 1971, a Texas juvenile court judge adjudicated the delinquency and ordered the incarceration of seventy-five minor children who had never appeared before a judge or in court with regard to his or her adjudication.

(3) Furthermore, during this same period, the juvenile court judge adjudicated the delinquency and ordered the incarceration of 124 minor children who were not represented by an attorney at a hearing or otherwise in connection with any such adjudication.

(4) In another Texas county, the designated juvenile court judge adjudicated the delinquency of 111 minor children between January 1, 1967, and May 21, 1971, only thirteen of whom were represented by legal counsel in connection with such adjudications; only one of the minor children who had appeared before that judge without an attorney in that length of time had been found "not guilty" (*i. e.*, had not been adjudicated delinquent).

(5) In another Texas county, the judges of the juvenile court adjudicated the delinquen-

cy of 4,733 minor children between January 1, 1967, and June, 1971; during that time a total of 374 minor children were represented by counsel in connection with adjudications.

(6) During July and August, 1971, this court sent questionnaires to the minor children who are inmates of the TYC requesting information regarding the number of children who were adjudicated delinquent and incarcerated in TYC institutions without the benefit of legal representation. The responses to those questionnaires revealed that of the 2,294 children who returned the questionnaires, 863 had hearings in juvenile courts but had not been represented by attorneys, while an additional 280 had received neither legal representation nor hearings in court in conjunction with their delinquency adjudications and subsequent incarceration.

(7) On September 19, 1972, there were still 565 minor children incarcerated in TYC institutions who had not been represented by an attorney in conjunction with their juvenile court delinquency adjudications and subsequent incarceration in TYC institutions.

(8) On October 31, 1972, this court entered an order, by agreement of the parties, which found that "in the juvenile justice system of the State of Texas there had been significantly regular and widespread lack of counsel representing minor children at juvenile court adjudicatory and dispositional hearings, (and) that this practice has continued through April, 1972. . . ."

(9) In December, 1972, upon petition submitted by attorneys for plaintiffs in this action, the Court of Civil Appeals, Third Supreme Judicial District, State of Texas, by an appropriate order directed the release of many of the minor children incarcerated by the TYC whose rights to legal representation at their juvenile court delinquency adjudications had been infringed.

(10) In failing to provide representation by attorneys for minor children in juvenile court delinquency adjudications, many judges of Texas juvenile courts have proceeded upon the philosophy of attempting to reduce the trauma of a courtroom experience for such children and have been motivated by their belief that the best interests of the children would thereby be served, even though the constitutional rights of the children were infringed as a result of such practices and beliefs.

12. *Declaratory Judgment*

1. The juvenile justice system of the State of Texas has been characterized by a widespread failure of many juvenile courts to provide constitutionally required due process protections for the minor children who are made subject to the processes of those courts. Specifically, certain juvenile courts

have adjudicated the delinquency of minor children and ordered them incarcerated or placed on probation without ever having afforded those children a hearing in court or any appearance before a juvenile court judge. Such a practice is in violation and derogation of rights guaranteed by the Constitution, and specifically due process rights as protected by the fourteenth amendment to the United States Constitution, of those children. To meet constitutional requirements, juvenile courts of the State of Texas must provide to each minor child who is made subject to the processes of a juvenile court the following elements of due process:

a. prior to any juvenile court proceedings, full notice and a copy of all charges on which such proceedings are to be based;

b. prior to accepting any confession, guilty plea, or agreed entry of judgment, the full warnings which are required by the decision of the U.S. Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966), to-wit:

(1) the right not to make any statements whatsoever,

(2) that any statement made can be used against him or her,

(3) the right to consult with an attorney *before making any statement or answering* any question,

(4) that he or she has a right to have an attorney present during any discussions with law enforcement or juvenile court personnel,

(5) that if he or she cannot afford an attorney, one will be provided at public expense,

(6) that he or she may stop answering questions at any time, and

(7) that there is no penalty for refusing to make a statement;

c. a hearing in open court;

d. an opportunity to confront and cross-examine adverse witnesses;

e. *an opportunity to present evidence;*

f. an opportunity to have a trial by jury;

g. a transcript of the proceedings;

h. a full explanation of the possible consequences of the proceedings; and

i. an explanation of the right to appeal from any decision of the juvenile court.

2. From the evidence it appears that it has been the practice of juvenile judges in the State of Texas to accept purported waivers from a minor and/or the parents or guardian of said minor to have an attorney represent the minor; or in some cases, to ignore the right to an attorney altogether. To meet constitutional requirements, all juvenile courts in the State of Texas must assure that *every minor child who is made* subject to the processes of any juvenile court is provided with an attorney at every critical stage in the proceedings against him

## VI. CRUEL AND UNUSUAL PUNISHMENT AND THE RIGHT TO TREATMENT

With respect to the plaintiffs' contentions concerning cruel and unusual punishment, it is clear that the eighth amendment's proscription applies to the state as well as to the federal government. Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). Moreover, the protection applies to persons who have not been convicted of crimes, such as juveniles involuntarily committed to the state's institutions. E. g., Lollis v. New York State Department of Social Services, 322 F. Supp. 473 (S.D.N.Y.1970).

The Court of Appeals for the Fifth Circuit has recently held that a person involuntarily committed to a state mental hospital in a civil proceeding has the constitutional right to receive such individual treatment as will give him a reasonable opportunity to be cured or to improve his mental condition. In this decision, the court articulated the two-part theory underlying the due process guarantee of a right to treatment under the fourteenth amendment. Donaldson v. O'Connor, 493 F.2d 507 (5th Cir. 1974). The first part of this theory holds that any non-trivial governmental abridgement of liberty must be justified in terms of some per-

or her. A "critical stage" in the proceedings includes but is not limited to any juvenile court hearing, whether it be for the purpose of detention, adjudication or disposition. To meet constitutional and state statutory requirements no juvenile court may accept from any child or his parents or guardians any waiver of the right to an attorney. Every minor child who does not have the financial resources to employ counsel must have counsel appointed to represent him or her at public expense.

### DIRECTIVE

1. This court has refrained from issuing an injunction to enforce the provisions of the Declaratory Judgment as set forth above in the belief that once the constitutional deficiencies of Texas juvenile court practices are made apparent, immediate steps will be taken to remedy the practices. However, to assure that the Declaratory Judgment is being complied with by juvenile courts throughout the State of Texas, this court will require information regarding the manner in which the juvenile courts intend to meet their constitutional obligation to provide attorneys to all minor children who come within their jurisdiction. With over 250 juvenile court jurisdictions in Texas, and with a longstanding practice of not providing counsel to minor children in juvenile court proceedings, this court is well aware that the obligation of meeting the constitutional requirements set forth above will necessitate the creation of additional approaches to the problem of providing such legal representation. The court therefore directs that defendants prepare, within sixty (60) days from the date hereof, a plan for the provision of legal representation and due process protections to minor children who come

within the jurisdiction of or have been incarcerated by order of any juvenile court in the State of Texas.

Such plan must include the following:

a. That the due process protections, as set forth in Paragraph 1(a) through 1(i) of the Declaratory Judgment contained herein, are provided by each juvenile court for every minor child coming within its jurisdiction;

b. That attorneys are actually provided by each juvenile court for every minor child at all critical stages of every delinquency adjudication;

2. Defendants shall report to this court, with copies to attorneys for plaintiffs, every sixty (60) days from the date hereof regarding the creation and implementation of this plan. Beginning one hundred twenty (120) days from the date hereof, said reports shall contain the name of every minor child adjudicated delinquent in derogation of the constitutional and statutory rights set forth herein and the name of the juvenile court which adjudicated the delinquency of each said child.

3. This court shall retain jurisdiction over this cause of action for all purposes. If the reports as submitted to plaintiffs' attorneys and to this court reveal, or if plaintiffs show by other competent evidence, at the end of one hundred eighty (180) days from the date hereof that the provisions of the Declaratory Judgment as above set forth are not being fully complied with, this court shall enter other and further relief as this court deems appropriate.

4. Defendants, by their counsel, the Attorney General of the State of Texas, shall notify every Texas juvenile court judge of the contents of this Order within sixty (60) days from the date hereof.

missible governmental goal. The governmental goals or interests typically advanced are danger to self, danger to others, and the need for treatment, care, custody, or supervision. In the instant case, the state is charged with a statutory duty to provide "a program of constructive training aimed at rehabilitation and reestablishment in society of children adjudged to be delinquent." Tex.Rev.Civ.Stat.Ann. art. 5143d (1971). This basis for commitment—to rehabilitate and re-establish the juvenile in society—is clearly grounded in a *parens patriae* rationale. Thus, under the *parens patriae* theory, the juvenile must be given treatment lest the involuntary commitment amount to an arbitrary exercise of governmental power proscribed by the due process clause.

Under the second part of the two-part due process theory, the government must afford a *quid pro quo* to warrant the confinement of citizens in circumstances in which the conventional limitations of the criminal process are inapplicable. The three central limitations on the government's power to detain are: (1) that detention be retribution for a specific offense; (2) that it be limited to a fixed term; and (3) that it be permitted only after a proceeding where fundamental procedural ·safeguards are observed. In their absence a *quid pro quo* must be extended by the government to justify confinement. As previously noted, the *quid pro quo* applicable here, by virtue of state statute, is rehabilitative treatment.

In tracing the support for the second part of the theory in *Donaldson*, the Fifth Circuit noted five groups of relevant cases. Among the fifth group of cases (each of which ordered injunctive and declaratory relief requiring that adequate treatment be provided in state-run facilities) were cases concerning juvenile delinquents. The decisions cited by the Fifth Circuit in the juvenile delinquency area were: Nelson v. Heyne, 491 F.2d 352 (7th Cir. 1974), aff'g 355

F.Supp. 451 (N.D.Ind.1972) cert. denied 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); Inmates of Boys' Training School v. Affleck, 346 F.Supp. 1354 (D. R.I.1972); and this court's earlier decision granting emergency interim relief in the instant case, 364 F.Supp. 166 (E. D.Tex.1973). Donaldson v. O'Connor, *supra*, 493 F.2d at 534 n. 32. *See also* Martarella v. Kelley, 349 F.Supp. 575, (S.D.N.Y.1972), enforced D.C., 359 F. Supp. 478 (non-delinquent juveniles held as being "persons in need of supervision").

Moreover, although the Supreme Court has never directly faced the question of whether a juvenile involuntarily confined in a state institution has a constitutional right to treatment, the Court has spoken to the underlying theory of the second part of the due process argument. In the landmark decision In re Gault, 387 U.S. 1, 22, 87 S.Ct. 1428, 1441, 18 L.Ed.2d 527 n. 30 (1967), the Court declared that:

> While we are concerned only with procedure before the juvenile court in this case, it should be noted that to the extent that the special procedures for juveniles are thought to be justified by the special consideration and treatment afforded them, there is reason to doubt that juveniles always receive the benefits of such a *quid pro quo*. . . . In fact, some courts have recently indicated that appropriate treatment is essential to the validity of juvenile custody, and therefore that a juvenile may challenge the validity of his custody on the ground that he is not in fact receiving any special treatment.

Finally, plaintiffs claim a right to treatment under state statute as well as the federal constitution, and the state concedes such a statutory right.[13] The basis for this statutory right to treatment is found in Tex.Rev.Civ.Stat.Ann. art. 5143d et seq. Jurisdiction of the state claims in this court is based on its pendent jurisdiction, since such claims

---

13. See defendants' Post-Trial Brief and Memorandum of Law, at 66–67.

and the federal claims "derive from a common nucleus of operative fact." United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). For a discussion of this "promise" of treatment, see Smith v. State, 444 S.W.2d 941 (Tex.Civ.App.— San Antonio 1969).

## VII. CONDITIONS AT TYC INSTITUTIONS

### A. Introduction

The findings of fact in this memorandum opinion are based upon evidence presented at the time of trial. The findings employ the present tense, for any changes that may have come about since the trial of the case do not affect the record upon which the court is solely entitled to rely. The only exception to this stylistic choice of verbs occurs when the court describes a practice that was prohibited by the court's Interim Emergency Order of August 31, 1973; such practices are described in the past tense, compliance with the court's order being assumed.

 The defendants have moved to reopen the record in this case for the presentation of further evidence relative to the changes that have occurred in the TYC program since the time of trial. The trial of this action took six weeks; the transcription of the record consumed another two months, and the court was not in possession of all of the briefs until March of 1974. It has acted as expeditiously as possible, since the subject matter of the case is of the utmost importance. A reopening would entail further delays, with the need for more discovery, trial, and briefing. The defendants had a great deal of time to prepare for this case; they were on notice from a very early date of the practices the plaintiffs were protesting and had, in the opinion of the court, ample opportunity to alter them prior to trial, if they had been so inclined. Moreover, the fact that conditions have changed, if it is a fact, does not alter the plaintiffs' right to relief from the practices of which they complain, for the defendants would otherwise be free to return to their old practices once the threat of litigation was averted. See United States v. W. T. Grant Company, 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); Jenkins v. United Gas Corp., 400 F.2d 28, 33 (5th Cir. 1968); Lankford v. Gelston, 364 F.2d 197, 203 (4th Cir. 1966). In the exercise of the court's discretion, the defendants' motion to reopen the record for the receipt of more evidence is denied.

One fruitful source of evidence concerning conditions at the TYC institutions was the testimony of four individuals designated by the court to be "participant observers." These trained experts were permitted, by order of the court, see 59 F.R.D. 157 (E.D.Tex.1972), to enter the premises of the various institutions, inspect the physical facilities, attend various functions, participate in daily activities, and speak to both staff and inmates. Their perceptions, so much sharper than those of an untrained visitor, were of invaluable assistance to the court, and form the basis for many of the court's findings.

### B. Physical Brutality and Other Forms of Abuse

1. Maximum Security Confinement: Mountain View State School for Boys

The Mountain View State School for Boys is the maximum security facility operated by the TYC. It is surrounded by two fences, both of which are topped with barbed wire. Prior to entry of this court's emergency interim relief order, a juvenile could be initially assigned to Mountain View on the basis that he had been adjudicated delinquent for a serious offense or he could be transferred there from one of the other TYC institutions for boys, usually Gatesville, as a result of a decision that his conduct was unsatisfactory. In either case, the decision was left largely to the discretion of the staff. Thus, there were at least some boys incarcerated at Mountain View whose delinquent behavior

consisted of such "status" offenses as truancy, incorrigibility, or running away from home. Also present at Mountain View were some boys who had been transferred there from other schools for such essentially non-violent, uncooperative behavior as swearing at correctional officers, refusing to work, or running away.

Mountain View's history, well known to the inmates of both Mountain View and Gatesville, has been one of brutality and repression. New boys placed at Mountain View are called "fresh fish," and are "tested" by various forms of physical abuse, applied by staff or other boys with the encouragement of staff. For example, one entering boy, identified as C. W., was initially beaten by the other boys in his cottage with the tacit approval of Correctional Officer Flores. Later that day, the boys who administered the beating were, in turn, "racked" by Flores—that is, forced to line up against the wall with their hands in their pockets while the correctional officer punched each one in the stomach. On the following day, while Correctional Officer Stovall watched, C. W. was hit and kicked by seven or eight boys in the corner of the cottage day room for more than an hour. After C. W. had been knocked unconscious, Stovall stopped further abuse, announcing that he did not want any "dead fish" on his hands.

Staff brutality at Mountain View is not ignored, but—by precept and example—encouraged, by those in authority. It was in evidence, for instance, that Assistant Superintendent Mack Morris slapped one boy in the face for talking in the superintendent's office. The evidence was also uncontradicted that the school principal slapped another boy in the face, back, and head for speaking Spanish. The Supervisor of Correctional Officers, Joe Gail Sassy, is notorious for his abuse. In one incident, Sassy called Correctional Officer Foster on the phone and directed him to send down a boy named "Slut" (M. A.). The boy went to Sassy's office and returned shortly thereafter with swollen eyes and jaw, blaming Sassy. In another case, Sassy called a boy out of his cottage for not reporting on time. When the boy returned from Sassy's office, his face was swollen and one eye was almost closed. In still another incident, Sassy broke up a fight between R. J. and H. C.; he then "racked" R. J. for approximately twenty minutes and R. C. for about four minutes.

Prior to entry of this court's emergency interim relief order, staff brutality was a regular occurrence in the security wing at Mountain View, called the Security Treatment Center (STC). In the sordid parade of evidence brought before the court showing incident after incident of physical abuse, two occurrences seem particularly brutal and cruel. In one of the incidents, Correctional Officer Supervisor Sassy interrogated W. B., after W. B. had attempted suicide. When W. B. did not answer his questions, Sassy hit W. B. several times, knocking the boy to the floor, and sprayed tear gas in his face from close range, shouting, "I have a way to make you talk." This outrage happened in a room five to six feet from Assistant Superintendent Morris' office. W. B. was taken to the infirmary; but the attendant asked him no questions about the tear gas and administered no medical treatment. W. B., pursuant to Sassy's instruction, made no mention of the tear gas in the subsequent incident report.

The second occurrence related to one, "Tweetybird," an allegedly homosexual boy given to screaming fits. On the occasion in question, the boy, for an alleged rule violation, was called from his solitary confinement cell in the STC by Correctional Officer Johnston, who took him down a corridor to a central location in the STC. There, Johnston proceeded to "rack" Tweetybird severely, then bound the boy's hands behind his back and blindfolded him. Johnston thereupon twirled the boy around several times and commanded him to run to his cell, the order being accompanied by threats of another beating if the boy did not proceed rapidly. In trying to follow

Johnston's order, Tweetybird ran headlong into the corridor walls several times; finally, screaming and crying, he fell to the floor. Johnston terminated the torture by placing his foot on Tweetybird's stomach and covering the boy's face with a mop. Complaints by another correctional officer to Supervisor Ross about this incident and other conditions in STC brought no results.

The use of tear gas on boys during the period preceding entry of this court's emergency interim relief order was widespread. Many of the instances involving tear gas were the subject of "incident reports," which are designed to record instances of the use of physical force by both inmates and staff of TYC. One such incident report, dated January 13, 1971, and identified by Clarence Stephens, Casework Supervisor at Mountain View, reported that one, M. F., threw down his pick and started running from a work detail. The boy was placed in the STC, and, for shouting, was afterward subjected to tear gas in his cell. Stephens identified incident reports of April 19 and 20, 1973, reporting that tear gas was used on one, B. L., with the permission of Assistant Superintendent Morris, when the boy refused to work and threatened to run. After being administered tear gas, the boy was examined at the hospital and then returned to a work detail. · The next day, when B. L. again tried to run away and was apprehended, Morris once more gave assent to tear gas being used on the boy.

A third report, dated October 25, 1973, reflects that D. F. ran away from a security work detail. After he was caught, D. F. was held by two correctional officers and sprayed with tear gas. A report dated August 31, 1964, indicates that tear gas was administered to a boy in a cell in the STC, for being "troublesome" and "uncooperative." The report reveals that Morris gave his approval to the procedure thus employed. Although Stephens reviews staff incident reports concerning staff brutality, including those reporting the use of tear gas, he has never inquired as to the

meaning of the phrase "sufficient force to bring [a boy] under control," which appears continually in these reports, often as a justification for the use of tear gas.

Although certain instances involving physical abuse of inmates by the staff are accurately reflected in the incident reports, many more are either unreported or inaccurately reported. It is common knowledge at Mountain View that reported incidents are deliberately falsified to protect the correctional officer, and that witnesses do not file incident reports of staff brutality for fear of retaliation. Even boys who testified about Mountain View at the trial of the civil action feared for their physical safety upon returning. It is not only the correctional officers who pose a threat. Certain boys, known as "office boys," are coerced or persuaded to act as enforcers for the officers in exchange for special privileges. Office boys will falsify reports to protect an officer, and may provoke an incident with a boy who has "snitched" to injure him or prejudice his chances for release.

Mountain View employment practices are not aimed at curbing staff brutality. The pre-employment screening of correctional officer staff at Mountain View consists of brief interviews with a correctional officer supervisor, the superintendent, and the assistant superintendent. There is almost no discussion of the use of force by the staff in these interviews. Furthermore, there is no pre-service training or orientation for correctional staff. New employees are instructed to follow other staff around to learn the rules on the use of force and to use their "own discretion." Prior to entry of this court's emergency order, it was customary for correctional officers to accept the use of severe brutality against boys, for frivolous as well as serious kinds of disruption. Thus, conduct justifying this type of punishment included anything from spitting on the sidewalk to attacking a correctional officer. The school principal instructed a new physical education teacher to slap any student who did not follow instruc-

tions. A former correctional officer was admonished by his supervisor that his job was in jeopardy, because he did not "rack" boys for fighting and failed to kick them when they stepped out of marching lines.

At staff meetings, new officers' requests for definitions of the phrase "out of control requiring force" were met with evasive answers. Although the correctional officers often talked among themselves about the brutality exercised against the children, the reporting of incidents of brutality to the superintendent was regarded as worthless, and only resulted in the suggestion to the reporting officer that he resign. One former correctional officer, Foster, was reluctant to testify about conditions, because he had heard that two teachers who testified concerning Mountain View were "blacklisted" from other state jobs.

Dormitories One and Nine at Mountain View were designated as "punk" dormitories, and were regarded by inmates and staff as the homosexual dormitories. Dormitory One has "homosexual" Black students; Dormitory Nine has only Anglo and Mexican American "homosexual" students. Prior to entry of this court's emergency order, boys were placed in these dormitories for having "homosexual tendencies," because they were "pressured" by other boys, or "didn't get along in the other dorms." The correctional officers, who are the least qualified and least educated of the staff and who have no special training in this regard, made these placement decisions. The Gatesville school psychiatrist, Dr. Charles Smith, never criticized such segregation to his superiors. The Mountain View Casework Supervisor, Clarence Stephens, although not critical of the practice, conceded that it "might be detrimental and not therapeutic."

The Director of Child Care for TYC, David Sandefur, was aware that Mountain View segregated certain boys by race, but did not know the reason. Although he testified that he trusted the judgment of the Superintendent and Assistant Superintendent as to this policy, he admitted that it would be more rational to separate the boys by passive and aggressive actions, rather than by race. He also conceded that labeling a child of thirteen to seventeen years of age as "homosexual" is detrimental to the child's welfare in any case. Nevertheless, Sandefur approved of the policy as necessary to maintain institutional control.

Expert witnesses were unanimous in concluding, however, that such labeling is inappropriate, destructive, and often inaccurate, because some experimentation with the same sex by adolescents is normal. Experts also testified that such labeling and segregation strips a child of his individual identity, does much to force him to homosexuality as a permanent mode of sexual expression, and is, therefore, extremely anti-therapeutic.

2. Gatesville State School for Boys

Dwain Place, Superintendent of the Gatesville State School for Boys, described his philosophy with respect to control and discipline as follows: "We don't have any punishment for discipline. We may have punishment for control. If you want to call it punishment, we use force for control. . . ." Although incident reports have recorded certain instances of brutality, the supervisory staff and, specifically, Superintendent Place, have taken no action whatsoever to eliminate the uses of excessive force. Thus, in a special incident report dated May 30, 1973, the investigating staff member, Carroll Duke, concluded that a correctional officer had struck R. C. several times without justification. The only action taken against the correctional officer was a verbal reprimand; there was no recommendation for firing or referral for criminal prosecution.[14] In another inci-

---

14. Place has made three referrals for criminal prosecution in the past three years, but he is unaware of the disposition of any of these cases. He first received written no-

dent, while a group of boys from the Hackberry Subschool of Gatesville were returning from a field trip by bus, one, Robertson, a teacher, in the presence of other teachers and correctional officers, struck, kneed, kicked, and punched W. H. and G. P. numerous times for pretending to fight in the bus. The boys in no way threatened the teacher or sought to fight back. W. H.'s eardrum was badly injured—"with a hole going straight through it." At the instruction of Robertson, W. H. falsified his report of the incident, stating that the injury was an accident. A concerned teacher intern witnessing the beating reported it to another teacher. The teacher told him, "If you stay around the school long enough you better get used to it, because you'll see plenty and worse." Several witnesses testified that Correctional Officer Schultz used excessive force against students on numerous occasions. One of his innovations included placing a boy's head between his, Schultz's, own legs and then running in place. Another of his variations was to stand on a boy's stomach.

The frequent use of certain forms of brutality has given rise to a jargon peculiar to the Gatesville inmates and staff. A "peel" is administered by forcing a boy to bend over, then striking him hard on the back with a fist or open hand. A "tight" is applied by forcing a boy to bend down, holding his own ankles and toes, then striking him on the buttocks with the handle or straw end of a broom. A boy is subjected to "brogueing" when he is kicked in the shins. Such punishment has been meted out for "wearing pants too low;" "losing a baseball game;" "leaving shoes out;" or "leaving cards out."

Gatesville incident reports, like those at Mountain View, are frequently never filed, and when filed, are often falsified. Victims do not report incidents of brutality to caseworkers or other staff, because such procedures are not explained to them. Retaliation for filing a report has included the assignment of extra duty to the complainant or his transfer to Mountain View for an eighteen-month stay.

Expert witnesses testified that it is very difficult, even with a conscientious staff, to detect brutality in a large institution. Although the most reliable source for such charges is inmate complaints, many inmates who first report brutality will often retract their reports. New or emotionally disturbed students, not knowledgeable in the ways of the institution, sometimes will "blurt out" instances of brutality. Dr. Jerome Miller, a particularly well-qualified expert, contended that such allegations should be investigated, even when the student later disclaims the charge. Dr. Miller explained that "most allegations, not all but certainly most, and virtually all of the serious allegations that come to us from young people, ultimately turn out to have some sound basis in fact and in reality." According to the expert witnesses, in a large institution such as Gatesville, which banishes the troublesome elements of its population to another institution such as Mountain View, repressive measures and corporal punishment are almost inevitable. Expert witnesses further concluded that knowledge of and opposition to brutality is apt to rise to the surface more quickly in small, community-based programs.

### 3. Girls' Institutions

Although brutality in the girls' institutions did not appear to be as widespread as that in the boys' at the time this court entered its emergency order,

tice of the policy of TYC to report staff brutality to the local prosecutor for criminal prosecution sometime in 1972. The applicable state statute is Tex.Rev.Stat.Ann. art. 5130 (1971). In April 1973, three months before this trial and over a year after Place states that he was notified that incidents of unauthorized force were to be referred for criminal prosecution, Correctional Officer Anderson was fired for using "unauthorized force" against a boy; Place claimed that Anderson's case was not referred for criminal prosecution because the boy was not seriously hurt.

some instances of physical abuse were nevertheless present. Some incidents occurred in school, *e. g.,* one Gainesville girl was slapped hard by her teacher after she threw her book on the desk; another was struck by one of the school principals. Some of the physical abuse was administered by houseparents, referred to sometimes as "papa" or "mama." A Crockett girl observed "Papa" Watson grab a girl by her hair and throw her into a STC cell. Another girl was similarly assaulted by "Papa" Watson when she did not sit down quickly; on four occasions, this same girl was injured when struck with an eighteen-inch key chain by "Mama" Watson.

### 4. Conclusions

Schools under the jurisdiction of the TYC, particularly Mountain View and Gatesville, have been the scenes of widespread physical and psychological brutality. In the emergency interim relief order, several practices found to be in violation of the eighth amendment's proscription of cruel and unusual punishment were enjoined on the grounds that such practices were so severe as to degrade human dignity; were inflicted in a wholly arbitrary fashion; were so severe as to be unacceptable to contemporary society; and finally, were not justified as serving any necessary purpose. *See* Furman v. Georgia, 408 U.S. 238, 257–306, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Brennan, J.); *see also* Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968).

Practices found by this court to violate the eighth amendment were: the widespread practice of beating, slapping, kicking, and otherwise physically abusing juveniles in the absence of any exigent circumstances, *see* Ingraham v. Wright, 498 F.2d 248 (5th Cir. July 29, 1974); the use of tear gas and other chemical crowd-control devices in situations not posing an imminent threat to human life or an imminent and substantial threat to property; the placing of juveniles in solitary confinement or other secured facilities, in the absence of any

legislative or administrative limitation on the duration and intensity of the confinement and subject only to the unfettered discretion of correctional officers; the requirement that inmates maintain silence during periods of the day merely for the purpose of punishment; and the performance of repetitive, nonfunctional, degrading and unnecessary tasks. Included as such tasks (the so-called "make work") were: requiring a juvenile to pull grass without bending his knees on a large tract of ground not intended for cultivation or any other purpose; forcing him to move dirt with a shovel from one place on the ground to another and then back again many times; and making him buff a small area of the floor for a period of time exceeding that in which any reasonable person would conclude that the floor was sufficiently buffed.

In addition to these practices, which obviously constitute some form of affirmative action on the part of the defendants, there are also certain abuses that arise because of a defendant's failure to act. Confinement under circumstances giving rise to a high probability of physical injury to inmates, whether because of insufficient custodial staff or otherwise, may constitute cruel and unusual punishment. *E. g.,* New York State Association for Retarded Children v. Rockefeller, 357 F.Supp. 752 (E.D.N.Y.1973). Two practices fall in this category of eighth amendment violations. The first is the practice of housing up to forty boys in an open dormitory, with the only correctional officer on duty locked in a "cage" and prevented from assisting boys in an emergency. This "cageman" is confined to a small area, elevated above the dormitory and separated from the two areas of the dormitory by wire mesh. He must call by telephone to other correctional officers outside the dormitory for assistance in times of stress. The second such practice is the failure to administer proper psychological testing or other screening procedures to eliminate potential staff members unqualified to treat juvenile

offenders. With respect to these two deficiencies, the National Advisory Commission on Criminal Justice Standards and Goals, Task Force on Corrections recommends the following:

Correctional authorities should:

1. Evaluate their staff periodically to identify persons who may constitute a threat to offenders and where such individuals are identified, reassign or discharge them.

2. Develop institution classification procedures that will identify violence-prone offenders and where such offenders are identified, insure greater supervision.

3. Implement supervision procedures and other techniques that will provide a reasonable measure of safety for offenders from the attacks of other offenders. Technological devices such as closed circuit television should not be exclusively relied upon for such purposes.

Corrections Task Force Standard 2.4, Page 31.

In addition to certain practices found unconstitutional under the eighth amendment, the emergency interim relief order held that the racially segregated dormitories at Mountain View were unconstitutional, Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L. Ed. 873 (1954); Washington v. Lee, 263 F.Supp. 327 (M.D.Ala.1966), aff'd 390 U.S. 333, 88 S.Ct. .994, 19 L.Ed.2d 1212 (1968), and that the segregation of some juveniles from the general population on the basis of suspected homosexuality, when performed by correctional officers untrained in psychology or any other field that would qualify them for such task, was unconstitutional as a violation of the juvenile's right to treatment.

All such practices found constitutionally deficient in the emergency interim relief order, except those relating to the abuses of the large dormitory setting and inadequate personnel screening, will be the subject of a final injunction. With respect to the abuses relating to the large dormitory setting and the inadequate screening of personnel, the parties will be directed to seek to agree on a plan consistent with the guidelines set out above by the Corrections Task Force. This court further directs the parties to attempt to agree on a plan for a grievance procedure designed to bring to the attention of TYC personnel, and ultimately the TYC Board, allegations of staff brutality or other forms of physical or psychological abuse.

### C. *Disciplinary Procedures*

#### 1. Security Treatment Center (STC), Mountain View

The security wing in the maximum security facility, Mountain View State School for Boys, is used to confine boys for disciplinary reasons. Although boys have been confined in security for as long as thirty days, the average period of stay is fifteen to seventeen days. The inmates are not informed of what conduct can or will result in security incarceration, and a decision to confine a boy is ordinarily within the complete discretion of a correctional officer. Records of Mountain View show that typical offenses and corresponding periods of incarceration include: "not doing exercises," twenty-three days; "gambling for candy," fifteen days; "trying to slip letters out," twenty-five days; "writing love notes to another boy," or "writing love letters to a lady academic teacher" or "refusing to work," fourteen days; "throwing a bar of soap at a boy," nine days; "masturbation," twelve days.

Each cell in the STC is a six-by-twelve foot locked room, with a solid door. The door has a small window, which is painted over, and a narrow slit for food trays. The cell's only artificial light resembles the headlamp on an automobile and is located in a wall near the door. This light is never turned off or dimmed and is presumably intended to keep the room's occupant awake. Moreover, the cell is poorly ventilated; it is hot in summer and cold in winter. On weekends and after 3:30 o'clock, p. m., the guard does not have a key to the

locked security cells. In an emergency, he must call out to a supervisor outside the unit to come and open a door. On one occasion, it took twenty minutes for the supervisor to open the cell of a sick boy.

Prior to the entry of the emergency interim relief order enjoining certain practices, the rules and work assignments were legion, and limited only by the sometimes vicious imaginations of the correctional officers in charge. Violation of the rules by a boy in the STC resulted in longer security incarceration or imposition of "racking." Such boys were not allowed to speak except to answer a staff member; and they were not allowed to look out the window. Until the rule was suspended in the spring of 1973, inmates of the STC were not permitted to sit on their beds during the day, to attend school, to have school books, or to go to sleep until 10:00 o'clock, p. m. If they fell asleep before that time, they were required to buff the floor and walls of their cell with a towel. The "no sleeping" rule applied to all boys, including those on sleep-inducing medication.

Many other examples were submitted in evidence of practices sanctioned by TYC staff, prior to entry of the emergency order: boys in security were allowed one visitor per month for ten minutes, and the visitor had to be accompanied by a supervisor; the boys' caseworkers were prohibited from visiting them in the STC; haircuts were administered to boys in the STC while lined up, heads bowed (boys who raised their heads were knocked down by a guard); while outside the security wing, boys in the STC were required to hold their heads down (although they were instructed not to do so when Special Agents of the Federal Bureau of Investigation photographed the security work detail).

One work detail for boys in security was "picking"—a useless, strenuous, degrading exercise performed five hours a day. When "picking", boys were lined up foot to foot, heads down, and were required to strike the ground with heavy picks, swung overhead as the line moved forward. Nothing was ever planted in the picked ground. The regimen consisted of working for an hour and a half at a time with fifteen-minute breaks. During the breaks, the boys were required to sit in a line with their heads between their legs, looking down; they were not allowed to look in either direction or to talk. Boys in the STC who refused to leave their security cells to work on this detail were often forced to endure the introduction of tear gas into their cells. An infraction of a rule relating to the "picking" detail was the subject of summary, brutal punishment. For the less than heinous offense of talking while he was picking, one boy was punched in the chest by a correctional officer until he doubled over, and was then hit in the mouth. Others were beaten because they dropped their picks or became ill.

Review of placement in the STC is done twice weekly by the discipline committee, which consists of the superintendent, assistant superintendent, school principal, casework supervisor, correctional officer supervisor, and one chaplain. Before the entry of the emergency interim relief order, the committee review procedures were often violent. A boy under review by the discipline committee was required to run in his bare feet—at top speed—from the security wing to the committee meeting room. If the boy did not run fast enough, he was "racked" or beaten by a correctional officer. A boy before the committee had no advocate, and his caseworker was usually not there. He was never told at the meeting whether he was to be released or any reasons for the commitee's actions.

Expert witnesses were unanimous in concluding that it is anti-therapeutic and psychologically destructive to confine a child in the STC for as long as thirty days for disruptive behavior. Expert witnesses also found no merit in the rule of enforced silence, the ban on sleeping, the unrestricted use of tear

gas, and the demeaning procedures before the discipline committee. It was also their judgment that most other so-called disciplinary practices at the Mountain View STC have no rehabilitative value; that they are strictly punitive and serve only to degrade and belittle the boy concerned. Expert witnesses further testified that isolation (or complete segregation from the group and program) should take place only in a child's individual room; that restrictions should be placed on the duration of the confinement; and that caseworkers should be required to visit the confined juvenile regularly.

### 2. Mountain View

Like the boys "on the hill" (in the STC), who are assigned the "picking" detail as punishment, those in the nonsecurity portions of Mountain View, prior to the entry of the emergency interim relief order, were also assigned certain degrading, make-work tasks. One such "extra duty" task was "grass pulling." For as much as two hours at a time, without a break, and for as long as six hours a day, boys were required to pull grass from the ground. In fulfilling this task, they were ordered to bend at the waist, keeping their knees straight, without looking at or talking with other boys. Although this position was extremely uncomfortable and difficult to maintain for a long period of time, boys bending their knees were "racked," kicked in the teeth, punched, and beaten.

Boys were put on this extra duty for such offenses as "talking back," talking in the "chow line," "not finishing all the food on their plate,". "wearing shoes in the dormitory," "not changing their pants," "just irritating a correctional officer," or "going in the peach orchard without permission." At some time in the late spring of 1973, after experts and counsel had visited Mountain View, the grass pulling position was changed to permit the boys to bend their knees.

The "grass pulling" detail was often associated with various acts of violence by the staff. One particular incident is revealing. While on grass pulling duty in March 1973, R. J. became tired after three hours and bent his knees. For this, he was kicked in the back and punched in the mouth by Correctional Officer Doyle, and told to go back to pulling. When he again became tired and started to stand up, Correctional Officer Schnick kicked him in the head with his booted foot. (Schnick's height is six feet, two or three inches; he weighs about 200 pounds. R. J. was five feet, six inches in height and weighed approximately 110 pounds.) When R. J. complained that his side hurt, Schnick told him to keep pulling, and later kicked R. J. twice more in the head. Apparently desperate, R. J. escaped from the work detail and ran to the superintendent's office. There, he met Correctional Officer Supervisor Freeman, who pulled the boy into his office by the neck. After slapping R. J., the officer told him to get up against the wall and put his hands in his pockets. Freeman (in the presence of Correctional Officer Supervisor "Chop Chop" Wimberly [15]) then struck the boy many times in the jaw and stomach with fist and open hand, and kicked R. J. when the boy fell down. Freeman thereupon ordered another boy to bring R. J. clean clothes (to replace his bloody ones), made R. J. sign a false incident report written by Freeman, and then hit R. J. in the jaw again. Subsequently, Freeman directed R. J. to run back to "grass pulling" duty. Freeman followed R. J. closely in a pickup truck, all the while racing its engine. Late that evening, R. J. was placed in the STC for running away from work duty.

A Mountain View teacher, Jones, who had observed Schnick's brutality to R. J. on the grass pulling detail, reported to Correctional Officer Supervisor Freeman that he thought the discipline was "too rough." In response, Freeman

---

15. Supervisor Wimberly acquired the nickname "Chop Chop," because he prefers to beat the boys around their eyes.

merely shrugged his shoulders. When Jones explained to Mountain View Superintendent Adams how the boy was punched and kicked, Adams told Jones that Schnick "probably thought he was doing the right thing at the particular time" and that "if [he] didn't like the way things were run around there [Jones] could find another job." Jones was not asked to make a written report on the incident or told that he could do so by either Freeman or Adams. Schnick was still employed at Mountain View as of July 1, 1973, at least four months after the incident.

In another incident, T. A., who was assigned one night to "grass pulling" duty, performed the task while resting his weight on both knees. When this violation of the rules was discovered, he was called to the supervisor's office by Correctional Officer Supervisor Sassy. The officer had the room cleared, then instructed T. A. to put his hands in his pockets and get up against the wall. Sassy (described as being about six feet, two or three inches in height and weighing about 290 pounds) then "racked" T. A. and punched him in the face and chest, causing significant injury to T. A.'s nose and mouth. T. A. was subsequently ordered back to grass pulling. Late that evening, he was forced by Sassy to sign an incident report saying that the injuries were sustained when he was struck by a football. On this occasion, Sassy threatened T. A., stating that if T. A. did not sign the report, he would "lock [T. A.] up and get [him] for it." Only then was T. A. permitted to go to the infirmary for treatment. The incident report was a complete falsification, written by another boy at Sassy's direction.

Another degrading, useless, make-work task at Mountain View is placement "on shovel." When performing this detail, boys line up in a circle with shovels, run around the circle with a shovelful of dirt, and then drop the dirt in another pile. This fruitless activity may continue for as long as six hours at a time. When lawyers started visiting the institution in August and September of 1972, the dirt circle trails were obliterated by "picking," so that evidence of this extra duty was not visible.

### 3. Gatesville

Boys arriving at Gatesville are neither given copies of the rules nor given any instructions as to their nature or content. Rather, each correctional officer imposes his own set of rules, placing the burden on the new arrival to learn either by his own mistakes or from those of others. Before entry of the emergency interim relief order, Gatesville, like Mountain View, had a variety of "disciplinary" measures. One form of punishment was placement "on crumb"—sitting on a chair in the dormitory day room all day long, facing a wall, and neither talking nor participating in any activities. In one case, a boy talking while "on crumb" was slapped off his chair, then kicked and struck by Correctional Officer Schultz. In another case, a boy falling asleep when "on crumb" was forced to stand and hold a chair off the ground at arm's length for an agonizingly long period of time.

Other practices included shaving a boy's hair because he did not keep it combed, shaving a boy's face with a pocketknife, and, for smoking, requiring a boy to stand against the wall with his arms in the air. Extra duty also included forcing a boy to work in the "R. D." (a sewage or garbage ditch). After working in this ditch, up to the waist in garbage and stench for four hours, a boy would then be required to go to lunch without changing clothes or taking a shower. Superintendent Dwain Place instituted no investigation of any kind into allegations made at the trial of this case that boys were forced to do such unproductive and humiliating labor, and indicated that he had no intention of doing so. He felt that, although working in the "R. D." ditch would not be helpful to a boy, such work could be justified, because, in his judgment, anything that helps the staff control boys is therapeutic.

#### 4. Crockett

Girls entering Crockett State School for Girls are given a copy of some of the rules regulating their conduct in the institution. Violation of these rules may result in a girls' confinement in the Security Treatment Cottage (STC). During the period preceding entry of the emergency interim relief order, many girls were kept in STC longer than the thirty-day maximum permitted by TYC policy. In Superintendent Harrell's opinion, TYC policy was not violated by keeping a girl in the STC for thirty days, letting her out a few hours, and then putting her back in. Although the professed purpose of confinement in the STC was not punishment, girls were not permitted to talk to fellow students while there.

Another disciplinary measure was placement of a girl in "room lockup." This meant that the room was stripped of all furnishings, forcing the girl to sleep on the floor. One girl was put on room lockup for seven days without clothes and shoes; another was allowed out of her locked room only for an hour and a half each day, received no academic education, and was visited by no one except a psychiatrist, and then on only one occasion. Still another girl was confined in the STC for twenty-four days and was never visited by a psychiatrist or her caseworker. She had been in the STC eleven times while at Crockett. An average stay in the STC was seven to ten days.

Superintendent Harrell testified that since the girls perceived the STC as punishment, he abolished it in June 1973, without the knowledge or approval of the TYC Central Office. Under the new system, a misbehaving girl is placed in the individual room of a regular cottage when isolation is necessary. Harrell's new procedure is very similar to that adopted by the court in its emergency order.

#### 5. Gainesville

Unlike the girls entering Crockett, those arriving at Gainesville receive no written rules regarding conduct. Girls are sent to the STC at the discretion of the staff; they are not told the reason they are sent. Misconduct meriting discipline includes whispering, "lagging" in line, calling a houseparent "Honey," and chewing gum. The weekly discipline committee ordinarily does not meet as to a girl's placement in the STC until after transfer; thus, one girl was in the STC for six days before the first meeting of the committee relating to her case. The average stay in the STC at Gainesville is fourteen days. Girls are not visited by their caseworkers while in the STC; often they see nobody outside the STC except for the discipline committee.

The STC consists of individual, locked rooms in a cottage. Four STC rooms are stripped cells, where the only piece of furniture is a bed. A girl can be placed in the STC by the staff supervisor on duty at the time a problem arises; if in the academic school, a girl can be placed in the STC by a teacher who has no training in the treatment of adolescent girls. The practice of not allowing girls to wear their own clothing in the STC and forcing them to wear loose-fitting nightgowns, observed in March 1973, was changed just prior to the trial of this case. Moreover, about one-third of the girls in the STC recently have been permitted to attend regular academic classes.

#### 6. Brownwood

Both the Brownwood State School and Home and the Brownwood Statewide Reception Center have provisions for security measures, some of which served as something of a model for this court's ruling regarding secure confinement in its emergency interim relief order. Under its former program, girls, on the recommendation of a psychiatrist, psychologist, or caseworker, could be placed in the STC for escaping. A girl could also be put in a stripped isolation room for up to thirty minutes without staff contact. During the week, the offending girl's social worker was required to approve a security transfer;

on weekends, it was the function of the houseparent supervisor. Caseworkers were required to visit girls in isolation daily. Girls wore their own clothes and usually attended regular school after the second day in isolation. Brownwood is contemplating a crisis intervention program with "floating" staff to treat the girls who need security treatment in their cottages. The Brownwood Reception Center's security wing includes five stripped cells. Any girl incarcerated there is given a blanket and wears pajamas. The staff usually manages to deal with girls who pose problems in the regular rooms without resorting to punishment or confinement in security. The security wing at Brownwood was not used more than five or six times in the year prior to July 1973. Before entry of this court's emergency order, however, a girl entering confinement in the STC might remain there as long as it was felt necessary to control her behavior—whether twenty minutes or several days.

### 7. Conclusions

■ Although some TYC personnel, testifying in behalf of the defendants, indicated that they did not impose "punishment" on juveniles, but rather "special treatment" or some form of "behavior modification," such semantical differences are not worth pursuing for purposes of this analysis. Any substantial deprivation of liberty or property, regardless of its characterization, may raise a due process claim under the fourteenth amendment. *E. g.*, Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Yet certain forms of disciplinary action, special treatment, or behavior modification are not substantial enough to require the imposition of due process procedures prior to the taking of such action, and may be continued by the defendants. Such disciplinary action, special treatment, or behavior modification must, nevertheless, be consistent with other sections of this court's order regarding cruel and unusual punishment and the juvenile's right to treatment.

In the interim emergency relief order, this court identified the placement of a juvenile in a secure facility (either solitary confinement, security, or dormitory confinement, as those terms were defined) as a substantial deprivation of liberty requiring invocation of certain due process procedures. Under that order, "solitary confinement" (defined as the placing of a TYC inmate alone in a room (other than a locked or otherwise secured room or cell in the inmate's own dormitory)) is permitted only when such confinement is clearly necessary to prevent imminent physical harm to the inmate or to other persons or clearly necessary to prevent imminent and substantial destruction of property. Placement of a juvenile in "security" (defined as the placing of an inmate in a locked or otherwise secured building which may contain one or more solitary confinement rooms or cells) is permitted only when clearly necessary to prevent escape or clearly necessary to restrain behavior that creates substantial disruption of the routine of the institution. Finally, "dormitory confinement" (defined as the placing of an inmate alone in a locked or otherwise secured room in his own dormitory) is provided as an alternative to either solitary confinement or security, but subject to the same standard for determining whether confinement is proper.

Confinement in either solitary confinement or security is not permitted under the emergency order for longer than three consecutive days, in the absence of a written report prepared and signed by the inmate's caseworker, detailing the justification for such confinement. Moreover, the burden of preparing such reports shifts to the executive director of the TYC after five consecutive days of solitary confinement, and after ten consecutive days of security confinement.

■ From a study of the post trial briefs of the parties, this court concludes that these procedures do not provide a constitutionally sufficient check on potential abuse of confinement in sol-

itary confinement or security. The court further concludes that due process requires the imposition of certain procedures to be invoked after five consecutive days of solitary confinement and after ten consecutive days of security confinement. These procedures will require: that the juvenile be given a hearing before an impartial tribunal, the exact composition of which the parties should seek to define in their negotiations, as hereinafter prescribed; that such tribunal file written findings within forty-eight hours following the date of the hearing with the executive director of the TYC; and that the executive director file forthwith copies of such findings with this court and all counsel until further order from this court. At his hearing, the juvenile shall have the right to representation by an advocate of his choice (presumably his caseworker) and shall have the right to call witnesses and to cross-examine the witnesses testifying against him. *See generally* Nelson v. Heyne, *supra;* Inmates v. Affleck, 346 F.Supp. 1354 (D.R.I.1972); Lollis v. New York State Department of Social Services, 322 F.Supp. 473 (S.D. N.Y.1970), 328 F.Supp. 1115 (S.D.N.Y. 1971).

The testimony of the expert witnesses was to the effect that a small portion of the juvenile population may require a secure setting. However, a decision initially to place or transfer a juvenile to such a secure setting must be in accordance with procedural due process. *See* Baxstrom v. Herold, 383 U.S. 107, 86 S. Ct. 760, 15 L.Ed.2d 620 (1966) (prisoner transferred to a mental hospital without judicial determination violates equal protection); Shone v. Maine, 406 F.2d 844 (1st Cir. 1969) (juvenile trans-

ferred to prison requires due process); People ex rel. Goldfinger v. Johnston, 53 Misc.2d 949, 280 N.Y.S.2d 304 (Sup.Ct. 1967) (juvenile transferred to "defective delinquent" institution requires hearing); Morris v. Travisono, 310 F.Supp. 857 (D.R.I.1970) (classification changes within prison require written record and reasons for contemplated change in status).

In its emergency interim relief order, this court provided that, before a juvenile could be assigned or transferred to the maximum security unit [16] (presently Mountain View State School for Boys), it would be necessary that the classification committee make a determination that the juvenile had in the past (either prior to or subsequent to commitment) committed acts that, if committed by an adult, would constitute certain serious offenses, which were enumerated by the court.

After consideration of the arguments contained in the briefs of counsel, the court is now persuaded that the commission of a particular offense does not necessarily imply that the offender should be subjected to confinement in a maximum security facility. Instead, the standard for determining whether a juvenile should be assigned to such a facility must be based on a finding that the juvenile is exceptionally dangerous; that is, that he will likely cause severe injury to himself or others unless dealt with carefully in a secure setting. The determination of this standard must not be entrusted to laymen; it is requisite that it be made by majority vote of a panel of well-qualified psychiatrists and psychologists.[17] Moreover, the Board must make its decision only after complete and painstaking

---

16. A maximum security setting, as the term is used in this discussion, refers to any secured facility designed to prevent those confined from escaping. Juveniles assigned to non-secure settings, such as Gatesville and all other facilities except Mountain View, are not physically prevented from leaving the grounds during the day but are deterred ordinarily by the threat of assignment to Mountain View.

17. It is particularly noteworthy that none of the psychiatrists employed by the TYC was shown to be a Diplomate of the American Board of Psychiatry and Neurology, and that none of its hired psychologists listed as a qualification membership in the American Psychological Association.

psychological testing and psychiatric diagnosis, as well as a thorough review of the juvenile's history. A finding of exceptional dangerousness will carry with it authorization for secure confinement and intensive treatment.

A determination that a juvenile is exceptionally dangerous may be made only after a hearing, and will be deemed to be invalid unless accompanied by written findings showing an adequate basis to justify the decision. The juvenile under consideration should have the right to be present and be represented at the hearing (but need not be present during the Board's deliberations); have the right to ask any questions or make any statements that he wishes; have a reasonable opportunity to call witnesses and present other evidence in his own behalf, after hearing the evidence against himself; and be given a copy of the written findings and decision of the Board.

The procedures outlined above shall apply to all decisions regarding the placement of juveniles in a maximum security setting. However, upon initial placement in the custody of the TYC, a juvenile reasonably suspected of exceptionally dangerous propensities may be placed in the maximum security facility for a period of time not to exceed seven days, upon an express order from the Executive Director. At the conclusion of the seven-day period, the Board authorized to assign or transfer juveniles to maximum security must have rendered its decision in accordance with the foregoing procedures or the juvenile must be released for non-secure treatment.

## VIII. ASSESSMENT AND PLACEMENT

The TYC operates two reception centers. The Statewide Reception Center for Girls, located at Brownwood, possesses a maximum capacity of 100 girls and is under administration of the General Superintendent of the Brownwood State Home and School for Girls. The Statewide Reception Center for Boys, located at Gatesville, has a capacity of 120 boys and is administered by personnel under the direction of the General Superintendent of the Gatesville State School for Boys. Girls remain at Brownwood for approximately two weeks. The primary purpose of the classification procedures at both reception centers is the assignment of students to the various training schools and the provision of certain diagnostic and social information about the child. Nevertheless, there are no written formal criteria for assigning youths to any particular institutions, including Mountain View, the maximum security facility for boys.

### A. Gatesville Reception Center for Boys

The Gatesville Reception Center handles about 1,700 boys per year, of whom about two-thirds are new commitments. The other one-third are reclassification cases (boys transferred from Gatesville to Mountain View) or parole revocations. The reception center staff consists of five caseworkers, two psychologists, one educational diagnostician, and three part-time psychiatrists. Both psychologists have a Master's degree. One spends a little more than half his time testing boys over sixteen for vocational rehabilitation services, which are rendered by the Texas Vocational Rehabilitation Agency after the boys' discharge from the institution. The education diagnostician has a Bachelor of Arts degree; three of the five caseworkers have Master's degrees. Although it is often necessary to evaluate Mexican Nationals and Mexican American boys, no one in the Gatesville Reception Center speaks Spanish.[18] Approximately one-third of the new admissions are Black, but none of the staff, whether professional or non-professional, is Black.

18. According to one of the psychologists at Gatesville, it is impossible to obtain an accurate assessment of boys who speak primarily Spanish at Gatesville.

Placement decisions, which take only a few minutes, are made by a classification committee in weekly meetings. The committee consists of the Director of Admissions, the Director of the Reception Center, a clinical psychologist, a medical psychiatric social worker, a chaplain, a casework coordinator, and an academic superintendent. The committee may consider up to thirty-five cases in a single session, with discussion primarily centered on the nature of the particular boy's offense. Age, sex, aggressiveness, educational level, and availability of a vacancy at a particular school are also determining criteria in placement. Aggressiveness is determined mainly on the basis of the boy's past record of behavior or his size. The caseworker's recommended placement is generally approved. Since the classification committee does not usually have the time to read the information in a boy's file before making a placement decision, and since the boy is not present during its deliberations, the committee relies on the oral presentation of the intake social worker who makes the placement recommendation.

In considering assignments to Mountain View, the maximum security facility, the committee reviews the juvenile's past legal history, including arrests. The record received from the juvenile court, however, often does not show the disposition of arrests. Moreover, there are no formal written criteria regarding which boys should be sent to Mountain View. Serious offenders as well as runaways from Gatesville may be sent there. In the fiscal year ending August 31, 1972, thirty per cent of the boys admitted to Mountain View were reclassified students from Gatesville. Yet the evidence showed that neither members of the classification committee, nor the TYC Central Office staff who must approve any transfer to Mountain View, have any familiarity with the program at Mountain View.

The frequent turnover of personnel on the classification committee disrupts any continuity of its classification decisions.

Thus, the psychologist who tests a particular boy may not be the one who participates in his placement decision. If the social worker at the classification committee is not the same intake officer who interviewed the particular boy being placed, it is unlikely that anyone on the committee will have had any personal contact with him.

Examination by a psychologist or psychiatrist is not necessarily available to every boy entering the reception center. Moreover, the psychologist does not ordinarily make treatment recommendations for the boys examined, and makes no follow-up investigation or report as to the boys he does examine or test, to ascertain what kind of treatment they receive after placement. Even a boy under consideration for placement in Mountain View may not be seen by a psychiatrist. When the psychiatrist has recommended against placement of a particular boy in Mountain View, he does not ordinarily receive a report from the classification committee as to what happened to him. Although they are presumably otherwise qualified, the psychologists at the reception center have not had prior training in working with adolescents and do not perform any in-service training for the staff at the Gatesville school.

### B. *Brownwood Reception Center for Girls*

Brownwood Reception Center classifies girls into four categories: immature delinquent, neurotics, unsocialized delinquents, and subcultural delinquents. Although these categories are used in assigning girls to cottages and treatment programs at Brownwood, they are not used at Gainesville or Crockett. These classification categories, developed by Dr. Quay, have not yet been validated on a female population, but were developed and tested on an older male population at the Federal Youth Center at Morgantown, West Virginia. The Reception Center at Brownwood has one individual on its staff with a Master of Social Work (MSW) degree and three

holding Bachelor of Arts degrees in psychology or social science. Its director also holds a MSW degree.

The final placement decision for a girl is made at a meeting attended by the medical psychiatric caseworker, the girl's caseworker, the academic educational-vocational counselor, the houseparent supervisor, the chaplain, a school teacher, and, sometimes, the psychologist. The girl under consideration is not present at the placement decision. Although a letter is sent to the girl's family requesting any information that would be helpful in assessing her, the director of the center testified that he would prefer, as an alternative, to meet with each girl's family to discuss her problems. Entering girls receive a medical and dental checkup as well as a psychiatric interview. The eleven subtests of the Weschler Intelligence Tests are used to diagnose learning disabilities. The Lorge-Thorndike Intelligence group-administered test is not used, because it is considered insufficiently individualized to provide an accurate assessment of the girls.

Girls may be assigned to Brownwood, Gainesville or Crockett. The younger girls are customarily assigned to Brownwood. Eighty per cent of the girls assigned to Brownwood were committed for offenses such as runaway or truancy, offenses which are not within TYC jurisdiction after September 1, 1973, under the new Texas family law code.[19] The older and allegedly more "sophisticated" girls, on the other hand, are sent to Gainesville. Gainesville, in August 1973, had a population of about 120 girls, a reduction from a total of 220 present in the institution a year before. The testimony of expert witnesses indicated that these girls perceive themselves as the worst offenders. The 1972 Annual Report of the TYC indicates that 124 out of the 220 girls at Gainesville during that reporting period were committed for "disobedience;" eleven for "immorality;" thirty-six for drug and alcoholic offenses; thirty-five for theft; and ten for violent offenses.

The Brownwood Reception Center has made some adjustments for Mexican American girls. Two Mexican American, Spanish-speaking caseworkers are included on the staff. Although Mexican American girls are given a vocabulary test before taking other tests and their scores on the other tests are then adjusted by a bilingual index, expert witnesses testified that the bilingual index does not adequately compensate for cultural differences and is, therefore, inadequate for diagnosing these girls. Expert witnesses also testified that these tests are based on middle-class cultural assumptions that will not accurately test a Mexican American's intelligence or achievement.

### C. Conclusions

TYC personnel and expert witnesses were in almost complete agreement with respect to two conclusions: First, since so few choices in placement are presently available to the classification committee at the Gatesville Reception Center, the classification procedure itself is practically meaningless. According to these witnesses, the present placement system accomplishes no more than would random placement on a space-available basis. Secondly, though the Brownwood classification procedures provide more opportunities for meaningful placement, these recommendations cannot be carried out at the receiving schools. At Crockett, for example, there is no attempt to write an individual treatment program for each student, and the recommendations from Brownwood are not considered a binding treatment plan. At Gainesville, attempts at written goals are made for each girl by her social worker; but expert witnesses were of the opinion that the plans are naive and over-simplified, by reason of the staff's lack of sophistication and training.

▄▄▄▄▄. On the basis of the evidence given by expert witnesses with respect

---

19. Tex.Rev.Codes Ann., Family Code Title 3, Acts 1973, 63rd Leg., p. 1460, ch. 544, eff. Sept. 1, 1973.

to the assessment and placement of juveniles, it is concluded that a juvenile's constitutional right to treatment requires the maintenance of the following minimal professional standards:

(1) Every child committed to a state agency by the juvenile court must have the benefit of an individual assessment, to serve as the basis for his treatment plan. The plan should include, *inter alia*, a family history, a developmental history, a physical examination, psychological testing, a psychiatric interview, community evaluation, and a language and education analysis evaluation.

(2) Social work staff involved in the assessment must be trained at the Master's degree level in social welfare or closely related fields.

(3) Social work staff must not have caseloads exceeding fifteen cases per week.

(4) Psychologists with Master's degrees and properly trained in testing procedures are adequate, but only if a Doctoral-level psychologist is available to supervise their work. A psychiatrist, however, must be available for interviews.

(5) For adequate classification, there must be daily contact between caseworker and juvenile, so as to evaluate the juvenile's amenability to guidance and counseling.

(6) The Weschler individualized intelligence quotient test, rather than the group Lorge-Thorndike IQ test, must be utilized.

(7) The Leiter and Weschler tests, which are standardized for Blacks and Mexican Americans and are calculated to better alleviate the discrimination factor, must be utilized.

(8) Adequate psychological testing should take approximately fifteen hours and require the services of one psychologist for every three boys classified per week.

## IX. ACADEMIC EDUCATION

### A. *Findings*

Although each TYC institution has been accorded the status of an independent school district by the Texas Education Agency, and each has been accredited by that agency, the quality of TYC education, particularly at Gatesville and Gainesville, compares unfavorably with the quality of general public school education in Texas, and reflects a dramatic lack of awareness of the special and varied needs of TYC students. Expert witnesses opined that only four and six-tenths per cent of all juveniles incarcerated by the TYC are at their proper educational grade level, and the average reading level is approximately five years below the norm.

All school facilities are operated eleven months of the year, except Mountain View, which is operated on a twelve-month basis. Students at Gatesville are placed in academic grade assignments according to the results of their achievement tests. Grades are labeled one through twelve, and a student is often assigned to a grade lower than the one at which he may have been functioning in his home community. At Brownwood, in contrast, students below the ninth grade in achievement level are placed in non-graded classes, according to age, and receive individual instruction.

No teacher at Gatesville or Gainesville is certified by the Texas Education Agency as qualified in the field of special education. Mountain View and Crockett each has one teacher certified for special education, and Brownwood has two. A statistical survey indicates, however, that a significant number of juveniles are in need of some form of special education. The following numbers of children at TYC institutions were diagnosed as being seriously emotionally disturbed as of May 1, 1973:

| | |
|---|---|
| Giddings | 18 |
| Gatesville | 117 |
| Mountain View | 158 |
| Brownwood | 13 |
| Crockett | 35 |
| Gainesville | 31 |

The category defined as "seriously emotionally disturbed" excludes sociopathic and psychopathic children. In addition,

as of May 1, 1973, the following numbers of children in TYC institutions have intelligence quotients recorded as lower than seventy:

| | |
|---|---|
| Brownwood | 17 |
| Crockett | 38 |
| Gainesville | 11 |
| Giddings | 5 |
| Gatesville | 102 |
| Mountain View | 36 |

The Language Training Center at Gatesville, for students with learning disabilities, currently serves those students whose diagnostic tests indicate this program to be appropriate for their needs; however, only students with intelligence quotients over ninety and who test two years below their grade level may participate in the program. Moreover, tests are not routinely given for minimal brain dysfunction or dyslexia at the classification center.

No bilingual programs for Spanish-speaking youths exist in any of the TYC institutions. Two applications for federal assistance to initiate such a program have been denied, and no state funds have been appropriated to institute the program. Tests of Spanish-speaking boys for intelligence quotients and reading achievement are not conducted in Spanish. At Gatesville, eighty-eight of a total of 106 teachers are Anglo. Questionably, as many as ten Gatesville teachers speak Spanish, although only two are Mexican Americans. Of the more than 1,000 students at Gatesville, approximately one-third are Anglo, over one-third are Black, and the remainder are Mexican American. In April 1973, there were thirty Mexican Nationals at Gatesville, awaiting return to Mexico by immigration authorities.

The educational testing procedures are generally inadequate, and since decisions regarding placement of students in educational programs at Gatesville are made primarily on the basis of the test scores, this is a significant deficiency. Irrespective of the reason, any Gatesville boy who cannot read is placed in the same remedial reading class. Thus, Spanish-speaking boys, retarded children, and those who are unable to read because of emotional causes or past truancy are placed in the same class. As mentioned earlier, these classes are not taught by persons certified as qualified in the field of special education. Moreover, tests for Spanish-speaking boys who may have learning disabilities—and who thus may be eligible for the class for dyslexic children—are not given in Spanish.

### B. *Conclusions*

On the basis of the evidence produced by expert witnesses with respect to academic education testing, it is concluded that a juvenile's right to treatment requires the maintenance of the following minimal professional standards:

1) The Weschler IQ Test, rather than the Lorge-Thorndike IQ Test, must be used for testing generally.

2) Neither the Lorge-Thorndike IQ Test nor the Gray-Votow-Rogers Achievement Test, which is inappropriate for testing Mexican Americans and Blacks on many subjects, should be used for testing for dyslexia.

Using as a foundation the evidence of expert witnesses, it is concluded that, for the purpose of detecting mental retardation in juveniles and providing them with the proper special education,[20] the juvenile's right to treatment requires the maintenance of the following minimal professional standards:

1) Normal IQ and achievement tests (both verbal and non-verbal) must be utilized, with special emphasis on tests

---

20. The Texas Department of Mental Health and Mental Retardation has legal responsibility for special programs for the mentally retarded, and TYC is required under law to make application for admission to Mental Health and Mental Retardation institutions on behalf of children who are determined to be mentally retarded.

which are appropriate for the student's background.[21]

2) Examiners who are familiar with the background of the student and of his culture and language must be a part of the staff.

3) Information must be obtained about the student's family background and emotional status, as well as observations relating to the student's behavior.

Again postulated upon the testimony of expert witnesses, it is the conclusion of this court that, as to special education teachers, a juvenile's right to treatment requires the maintenance of the following minimal professional standards:

1) Special education teachers, certified by the state as qualified to teach either emotionally disturbed, mentally retarded, or minimally brain damaged children, must be utilized to treat children in these categories.

2) In-service training by an outside consultant must be provided for special education teachers at least once a week. (Such consultants are available from the Texas Education Agency.)

3) A minimal teacher-student ratio for TYC students in the categories above specified is one special education teacher for each eight of such students, plus supporting personnel (such as educational diagnosticians and the like).[22]

As to other supporting personnel, this court adopts the opinion of expert witnesses that a juvenile's right to treatment requires the maintenance of the following minimal professional standards:

1) One educational diagnostician is essential for each 150–200 TYC students.

2) Assessment by language pathologists, sometimes referred to as speech therapists, is an essential complement to any other professional assessments, and such an assessment is necessary to diagnose the underlying learning difficulty that may be initially identified by a psychologist or teacher.

On the basis of the evidence of expert witnesses, this court concludes that, since the state removes Mexican American children from their family, friends, ethnic background and culture, transporting them in most cases hundreds of miles to a predominantly Anglo rural setting, these juveniles' right to treatment requires that the state establish a program for bilingual education. The parties are directed to propose such a program in general accordance with the provisions set out in United States v. Texas, 342 F.Supp. 24 (E.D.Tex.1971), aff'd 466 F.2d 518 (5th Cir. 1972), *discussed in* Project Report: DeJure Segregation of Chicanos in Texas Schools, 7

21. Testing procedures at the Brownwood Reception Center, for example, were more in accord with the consensus of evidence given by experts: Brownwood students are given the eleven subtests of the Weschler IQ test to diagnose learning disabilities, but the Lorge-Thorndike Group-Administered IQ Test is not used, because it is not sufficiently individualized to provide an accurate assessment of students. Educational and vocational evaluation at the Brownwood Reception Center consists of the Metropolitan Achievement Test, the Wide Range Achievement Test, the General Aptitude Test Battery, a School Attitude Questionnaire, and a hearing and visual evaluation. The Gray-Votow-Rogers Test is considered outdated, however, and is not used.

22. Although Brownwood has, at most, two teachers qualified in the field of special edu-

cation, the educational program is in sharp contrast to the programs of the other TYC institutions. For example, girls below the ninth grade in achievement level are placed in non-graded classes, according to age, and may receive individualized instruction. There is an attempt made to have programmed instruction, in order that students may be allowed to progress at their own pace; college students from neighboring colleges are utilized in tutoring students needing special help, and special education instructional materials from the Texas Education Agency's regional office are used. The ratio of teachers to students at the school is approximately one to five. Although no study to determine the performance of former Brownwood students in public school has yet been made, the school program is obviously designed to accomplish changes for the better.

Harv.Civ.Rights—Civ.Lib.Rev. 307, 376–91 (1972).

## X. VOCATIONAL EDUCATION

### A. *Findings*

A vocational program is available to certain TYC inmates, although the process of selecting those eligible for the program is not clear. The evidence admitted at the trial of this civil action primarily concerned the Gatesville program. Some boys are enrolled, at least in part, on the basis of an expressed interest. Nevertheless, there are no vocational counselors available at Gatesville and no established testing procedures to determine which boys should be enrolled. The vocational program consists of educational courses and so-called "work experience." Boys are assigned to the educational courses on a space-available basis, with the overflow reporting for "work experience."

Work experience programs at Gatesville consist of such essentially institution-maintaining endeavors as work in the laundry, maintenance division, warehouse, food service division, dormitory clothing room, and other areas. State funds have not been appropriated by the legislature for the payment for work performed in vocational shops maintaining institutional equipment, state-owned property, or in-service industries. Thus, Gatesville vocational students do not get paid for such work. Accordingly, the work experience program (which has been in existence at Gatesville for at least twenty-three years) permits the institution to employ fewer people to perform institution-maintaining work than would otherwise be required. Work experience supervisors at Gatesville are not accredited teachers, and the students receive no school credit for their work in the work experience programs.

Some attempt is made to coordinate the vocational education and the academic education courses at Gatesville; but the work experience program is not coordinated with academic education. Students are assigned to a full day's academic education program or to a half-day academic program, with the other half-day devoted to a vocational or work experience assignment. A full day's academic program is pursued by the younger students assigned to the Valley, Riverside, and Hackberry schools. A half-day academic and half-day vocational or work experience program is pursued by older students at the Hilltop, Live Oak, and Terrace schools. Students at the Sycamore school have a choice of following a full day's high school program or a half-day academic program, the other half of the day being devoted to a vocational course.

The work experience program altogether fails to provide any meaningful or realistic vocational training. The vocational education courses, although potentially useful, are not coordinated with a practical and realistic attempt at job placement outside the Gatesville institution. Since no follow-up study has been accomplished to determine whether Gatesville students are able to procure jobs in fields related to their vocational education training, the TYC has no way of evaluating the effectiveness of the vocational education programs nor of assuring that students leave the TYC schools with marketable skills. It is clear that there has been no employer or union input in fashioning the vocational education programs, for they have not been geared to meet actual employer needs or union requirements. There is, moreover, no ongoing contact by employers with the vocational education programs of the TYC schools, since the schools are too far removed from the major employers in Texas to make these contacts convenient.

Although one vocational rehabilitation counselor is present at Gatesville, he perceives his job as merely recommending students for vocational rehabilitation after their release from the TYC, and not as a part of the entire treatment program. Of the more than 1,000 Gatesville students, only about 130 are on the caseload of the vocational rehabilitation specialist. The vast majority of

the students are eligible for the services of the vocational rehabilitation specialist; but it is apparent that the one-man staff cannot adequately handle the caseload. It also appears that no systematic contact with the vocational education instructors is maintained by the vocational rehabilitation specialist, although the latter is responsible for evaluating the student's potential for success in vocational rehabilitation.

### B. *Conclusions*

 Giving weight to the evidence supplied by expert witnesses with respect to vocational education, it is concluded that a juvenile's right to treatment requires the maintenance of the following minimal professional standards:

1. Each student should be provided with an employability plan, based on extensive counseling regarding career options.

2. Adequate procedures to assure placement with prospective employers should be maintained by the TYC.

3. Adequate on-the-job training, obtained through work release programs, should be provided.

4. Adequate support services, such as remedial reading and mathematics, should be provided.

5. Appropriate limitations must be placed on the so-called "work experience" consisting of essentially institution-maintaining work, so as to prevent such work from dominating the daily activities of students.

## XI. INSTITUTIONAL LIFE

### A. *Introduction*

A great deal of the evidence heard by the court concerning the necessary elements of rehabilitation related to matters that might seem somewhat insignificant on first consideration—meals, recreation, and other aspects of everyday life. Nevertheless, the testimony of expert witnesses was substantially in agreement that a panoply of these seemingly unimportant daily experiences will have a critical effect—for good or for ill—on the rehabilitation of a delinquent adolescent. There was an impressive unanimity of opinion among the experts who testified, whether for plaintiffs, *amici*, or defendants, concerning many of these matters. Therefore, the findings and conclusions that follow, although they may appear dogmatic, merely accord proper weight to the heavy preponderance of the evidence given by the expert witnesses at the trial.

### B. *Minimal Elements of a Treatment Program*

A treatment program must aid the youth in achieving "the tasks of adolescence" that precede his emergence as an independent adult. These tasks include establishing sexual identity, developing intellectual and occupational skills, achieving independence from parental authority, developing a capacity for genuinely intimate relationships and, finally, evolving a moral code to govern future actions. Treatment of an adolescent who has tangled with the law or had difficulties with his family or school authorities must ensure that the juvenile receives the ingredients that a normal adolescent needs to grow and develop a healthy mind and body. Because of his often deprived background, the delinquent needs a more concentrated dose of these normal factors, together with such intensive or particularized help as special education, therapy, or physical rehabilitation that he may need. Unless normal needs are met, no special therapy modality will work, and the treatment program cannot be deemed an adequate one.

The essential ingredients of normality for a youth are a sense of self-respect, warm and understanding adults, a chance to participate in decisions that affect him, adequate diet and recreation, opportunity for adventure and challenge, and legitimate outlets for tension, anger and anxiety. In addition, the environment must promote the juvenile's feeling of security from fear of physical and

psychological abuse, and provide well-defined limits within which the juvenile knows his behavior is acceptable. The juvenile must also understand what is expected from him and what is hoped for him.

The function of a treatment program is to enable the juvenile to see himself as a significant person and as one capable of living and succeeding in society. Rehabilitation, therefore, should be a process of redirecting the juvenile's behavior, shoring up his weaknesses, stressing the positive in his behavior, and eliminating those aspects of it considered unacceptable in society. The expert witnesses concluded that without the minimum elements discussed above, no treatment program can expect to be successful in its efforts to rehabilitate.

### C. Placement Inside Institution

In the opinion of the experts who testified, some one person on the staff of an institution should be assigned to each juvenile and be held accountable for insuring that the child's treatment plan is followed. That person (who ordinarily would be a caseworker) must be familiar with the juvenile's background and should meet with the child's family. It must be his responsibility to explain and interpret the treatment plan to the staff who deal with the juvenile, as well as to the juvenile and his family. No one person is assigned primary responsibility for implementing a juvenile's treatment plan at Gainesville, Crockett, Gatesville, or Mountain View.

A primary step in implementing such a treatment plan is placing a juvenile in an appropriate cottage or dormitory with a compatible staff, since that is where the juvenile will spend the majority of his or her time. Caseworkers and cottage parents or dormitory staff should be "matched" to juveniles. Yet the evidence established that the backgrounds of the girls or their compatibility with social workers or houseparents attached to their cottages are not considered at Gainesville or Crockett, and the girls are given no choice as to cottage placement.

Boys in the TYC are not consulted about the school or dormitory to which they desire to be assigned. Their requests for supervision by certain caseworkers are not honored, and they are automatically assigned to the caseworker attached to the dormitory in which they are placed.

### D. Team Treatment Approach

Plaintiffs', amici's, and defendants' expert witnesses agreed that every staff member of a treatment facility or program must be considered a treatment agent and must cooperate with other staff members who deal with a particular child, so as to present a unified team approach toward his or her rehabilitation. In their collective opinion, it is crucial for a juvenile to feel that he or she is surrounded by a group of people who communicate well with one another and who cooperate in seeking to solve his problems. The "treatment team" for a particular child should include his social worker, his houseparent or group counselor, his teachers, and professional medical and therapeutic personnel. The team should, moreover, have regularly scheduled meetings about his case. Expert witnesses also agreed that caseworkers should be intimately involved in discipline decisions, and that discipline must be a part of the unified treatment approach toward a juvenile.

In the TYC institutions (possibly excepting Brownwood and Giddings), the casework, teaching, medical, and correctional staff operate under separate lines of supervisory authority. All staff members are under the ultimate supervision of the superintendent. Houseparents at Crockett do not generally review the social files of the girls in their cottages. They are charged with the responsibility of obtaining relevant information about a particular girl from the girl's social worker. A houseparent is generally forewarned of a girl considered a "serious offender." Houseparents at Gainesville usually know only the name, age, and religion of the girls in their cottages, unless a particular girl is

considered suicidal or violent. Although they are privileged to consult the girls' social files, they seldom do so. As of late fall, 1972, houseparents at both Gainesville and Crockett were not even aware they could consult a student's file. No ongoing collaboration between caseworkers and houseparents occurs at either Gainesville or Crockett, nor is there participation in joint training sessions. Caseworkers at Gainesville began to discuss with houseparents the "goals" of individual girls at some time in the fall of 1972, although these talks usually take place only after the girl has been in the cottage for about three months.

Teachers at Gainesville do not ordinarily see the reports, prepared at Brownwood, concerning the diagnostic procedures accomplished and conclusions reached as to the girls they teach. The Gainesville school vice-principal decides whether teachers need to know any of this information, e. g., an indication that a girl might be suicidal or a potential runaway. Teachers at Gainesville have no regularly scheduled meetings with other professional staff about particular girls. The Chief of Casework Services at Gainesville testified that although team treatment is desirable, there is no formal training at Gainesville to achieve the goals of integrated treatment, and that there are no regularly scheduled meetings between social workers, houseparents, and teachers, except a bi-annual conference to discuss individual girls. At Brownwood, houseparents and caseworkers in particular cottages meet weekly with the girls on general problems, but teachers do not participate in these sessions. A social worker at Brownwood does discuss the contents of a girl's file with the houseparent when the girl is first placed in a cottage.

At Gatesville, correctional officers do not meet with caseworkers nor do they have any verbal or written interchange of ideas as to boys or their treatment goals. The only interaction between correctional officers and caseworkers occurs at formal Adjustment Committee meetings. Caseworkers at Mountain View have no coordinating or supervisory role with respect to correctional officers, and the correctional officers are not encouraged to look at boys' files. In fact, a former correctional officer at Mountain View testified that the correctional officers are instructed *not* to discuss boys with caseworkers, and that he was personally reprimanded by his supervisor for doing so. It is worthy of note that caseworkers at Mountain View are not empowered to stop a correctional officer from placing a boy in the STC. If a caseworker feels that a boy is being treated unfairly by his correctional officer, he reports it to the casework supervisor rather than consulting with the correctional officer involved, since the correctional officers resent interference from the casework staff. Expert witnesses condemned discipline decisions made at Gatesville on the basis that they are made in an atmosphere devoid of any understanding of the motivation of boys to commit anti-social acts or the kind of handling best suited to individual boys. As a result, discipline is often irrational, because it is not an element of a cohesive treatment strategy.

### E. Dormitories at Gatesville and Mountain View

The testimony of expert witnesses was unanimous that adolescents need either single rooms or small rooms shared between two to four children, in order to have a healthy amount of privacy and solitude. Yet boys at Giddings, Gatesville, and Mountain View live in open dormitories, housing thirty to forty boys in one large room, with cots laid end to end. As already detailed, a "cage man" sits inside a wire mesh enclosure watching the boys, but he is forbidden to leave his enclosure until his replacement arrives the next morning, unless, in the event of an emergency, he first calls for assistance. The cage arrangement does not provide the feeling of a secure physical environment for boys, because they

know that the cage man cannot timely remove or protect them, if an emergency occurs.[23]

The cage arrangement provides the most intimidating and frightening environment possible for sleeping boys— they are subject to maximum surveillance and loss of privacy, yet they are almost entirely unprotected from assaults. Especially at an institution like Mountain View, which houses the most hard-core delinquent population, such an arrangement should be recognized as entirely unacceptable for treatment purposes.

The dormitories at Gatesville are crowded, and the lighting so poor that it is nearly impossible to do academic homework or read. Nevertheless, the boys spend most of their waking hours in the dormitories when they are not at school. Certain conditions vary between dormitories; this is not because of physical differences or diverse treatment emphases, but primarily according to the whims and attitudes of the various correctional officers that staff the dormitories. Indeed, rules and customs in a single dormitory may vary from day to day, depending upon which correctional officer is on duty and what kinds of behavior he permits or prohibits. All of the Gatesville dormitories have one characteristic: they are cold, impersonal, and insecure settings, entirely unconducive to the rehabilitation of delinquent adolescents. It is these dormitories that serve as the only home their residents have during their stays at Gatesville.

F. *Regimentation in the Institution*

The most striking characteristic of daily life in most TYC institutions is overwhelming monotony and regimentation. At Gainesville the rooms are like cells; each is furnished only with a bed, a dresser, and a small cubicle for clothes. The doors have locks. Safety

chains are on the outside, which permits them the doors to be opened about four inches when not latched. The light switches are outside in the corridor. Gainesville girls may leave their rooms at night only with the permission of their houseparent. They may not use the restroom at night, but must relieve themselves in chamber pots.

Some girls at Crockett have private rooms similar to those at Gainesville. In both institutions, girls with separate rooms are locked or latched in their rooms a great part of the time before and after school and at night. During the time they are locked in, they must call out if they are sick or in need of assistance. Whether a girl is latched into her room often depends solely on the convenience of her housemother. At Brownwood, girls have keys to their own rooms, but can be locked in their rooms from the outside. Girls who go from the relatively open physical setting at Brownwood to the latched doors at Crockett and Gainesville are not made aware of any reason for their being subjected to more rigorous confinement, with the result that most conclude that their behavior is only marginally related to the conditions of their confinement.

The justification given by the Gainesville staff psychologist for latching girls' doors was the impossibility of making individual decisions about who should or should not be latched in. He conceded that not all girls require such close confinement; his estimate was that twenty to fifty percent of the girls need to be latched in. The superintendent of Crockett stated that latching would be altogether unnecessary, if he had a larger staff.

Psychologists gave evidence that an across-the-board policy of locking girls in their rooms at specified times of the day is counter-rehabilitative; that it leaves the girls with the feeling that they are evil and untrustworthy, and in-

---

23. One child said, "I let the other boys beat me up, because nobody really cares and nobody really is going to intervene." This statement was typical of the nature of testimony given by TYC inmates.

capable of planning and directing their own activities.

Meals are regimented at Crockett and Gainesville. Girls are ushered into the dining room to the calls of "East side," "West side," "Let 'em out," "Put 'em up." The dishes are plastic. Meals are eaten quickly, and it is obligatory that conversations be quiet. Even the cook can order silence. At the end of the meal, the staff members demand that the girls sit with their hands in their laps while the silver is collected and counted.

Cottages contain a day room where the girls eat and seek recreation at specified times, usually for a two-hour period each evening and on weekends. Girls cannot leave their rooms except during specified periods for dining, recreation, or school, and cannot visit in each other's rooms. A certain amount of time each day is designated as "unsupervised recreation," but various restrictions imposed by institutional rules and houseparents make television, board games, and smoking the only real recreation possibilities. Dancing and other forms of physical expression are discouraged. In summary, cottage life makes the girls dependent on others for direction and discourages them from taking any initiative, structuring their own time, acting independently, or exercising imagination. There is, additionally, no opportunity for risk-taking or adventure in the Gainesville or Crockett programs; anything that deviates from strict rules is punished by a demerit or a "pink slip." This is so, despite the agreement of expert witnesses that opportunities for variety and challenge are essential to the growth of healthy adolescents.

Life at the boys' institutions is even more regimented than at the girls' school. At Gatesville, it is mandatory that boys arise at a certain time; they then sit idly until breakfast. Often, some fall asleep while lying on tables and waiting for the signal to go to breakfast. They walk in loose formation to the dining room and school. Some correctional officers require silence on these walks.

Boys spend time in the dormitories lined up in chairs watching television programs. On one occasion, an expert witness observed nearly an entire dormitory of boys sitting torpidly before a broken television set. Several witnesses described the appearance and climate of the Gatesville dormitories as a "prison,"—a "psychologically destructive brutal setting." Mountain View was graphically described as an "evil place," and compared unfavorably with the notorious Angola Prison in Louisiana.

### G. *Institutional Indignities*

According to expert witnesses, the program at Gainesville violates the girls' self-respect in many ways. The chamber pots in the girls' bedrooms are humiliating to them and violate such self-respect as they have managed to acquire. Girls are not allowed to walk around outside their rooms without permission. When the need arises, they are required to call, "Mama, can I go to the toilet?" No doors are placed on the toilets at Gainesville. Charts showing the menstrual period of each girl are posted in the housemother's office at Gainesville and on the cottage door at Crockett. Girls are subjected to "strip searches" of their bodies prior to family visits, and their rooms are torn up in unannounced searches.

There was uncontradicted testimony from one girl that she was called a "nigger" or "dog" by her houseparent at Gainesville every day, and heard the school principal call other girls by similar names. This girl also alleged that she was called "nigger" by her teacher in front of the whole class. When the girl reported the incident to the school principal, her humiliation was compounded when he told her that the teachers could call her whatever they wanted. It is also uncontradicted in the evidence that Black girls at Gainesville are forbidden to sit together at a meal table on penalty of a discipline report.

In one incident, certain girls at Gainesville were questioned and harassed by staff members for eight hours about alleged marijuana possession. One girl signed a false statement about the incident, in order to stop the ordeal. Four requests to see the superintendent to complain about this treatment got no response. Again, this evidence was not contradicted.

Boys at Gatesville are deprived of privacy. They may go to the toilet only at certain times. If they fail to make their beds in a prescribed way, they are assessed demerits; if they do not get up fast enough in the morning, their beds are dumped over them. On occasion, a "dorm man" will shave a boy with a pocketknife, if he is dissatisfied with the boy's appearance. Boys at Gatesville may have access to their books or personal possessions only at certain hours and then with permission; their possessions are often rummaged through by correctional officers without their knowledge or consent.

Expert witnesses testified that the results of continual violation of a juvenile's dignity, privacy, pride, and possessions is inevitably the exacerbation of delinquency rather than its cure, for such treatment teaches the juveniles that they are considered to be less than full human beings, and that their personal property is unworthy of respect. Worse, they are thereby tutored in the abuse of power over those weaker or gentler than themselves.

### H. *Diets and Mealtime*

The expert witnesses attested that providing for an adolescent's normal physical development is an important part of his or her needs. Such provisions must, of course, include adequate nourishment. In the case of adolescents, who go through spurts of rapid growth, a variety of nutritious foods must be available for a minimally adequate food program. It is also important that food be properly prepared and appealing.

Menus at TYC institutions are not planned by dieticians; food service man-agers perform this duty along with other duties. Students work in the kitchen, preparing and cooking the food, although they have not received any special health certificate for that purpose. Diets at Gainesville were described by a visitor as starchy and tasteless. Because girls get little outdoor exercise, they often gain excess weight on the starch-heavy diet. There are no special diets for pregnant girls at Gainesville or Crockett. Girls complain that they often find bugs or weevils in their food.

At Gatesville, it was the perception of many boys that the food was contaminated by other boys having urinated, spit, or defecated in it. An expert witness explained that regardless of whether such perceptions are accurate, they cause the boys to feel insecure and physically threatened, and many of them are discouraged from eating. It was the opinion of this witness that the situation is inconsistent with the feeling of security that a minimally therapeutic environment must provide.

Meals are eaten in all TYC institutions, possibly excluding Brownwood and Giddings, in an unpleasant atmosphere of haste, regimentation, and tension. Correctional officers allot boys at Mountain View ten to twelve minutes in which to clean their plates, destroying any pleasure the inmates might otherwise take in mealtime. More important, psychologists maintained that these practices reinforce the juveniles' disrespect for themselves and for each other, as well as depriving them of the nourishment that is essential to their physical and psychological growth.

### I. *Recreation: Girls' Institutions*

It was affirmed by the expert witnesses that adolescents have special physical needs with respect to freedom of movement. At Gainesville, however, there is little opportunity for outdoor exercise. Almost all time at Gainesville outside of school and household chores was "free" unsupervised time. As already set out, it is spent primarily in watching television and smoking. At

any one time, only small groups can participate in organized activities such as basketball or skating under the direction of a recreational supervisor.

An observer reported that during one weekend, when the weather was beautiful, the only time Gainesville girls left their cottages was to walk to the cafeterias for lunch and to church on Sunday. The afternoons were spent in the usual manner—watching television and smoking in the day room. The housemother declared that she did not have the authority to take the girls outside. A few girls in upper privilege level groups were permitted to go skating in the gymnasium for an hour. When indoor activities are organized at Gainesville, they are extremely puerile in nature, such as "poor kitty."[24] On weekends, the only variation in the routine is cleaning the cottage on Saturday morning, and going into the day room from two to four o'clock in the afternoon. About twice a month, the girls in a particular cottage are permitted to go outdoors for two hours on Saturday.

Brownwood, by way of contrast, has a four-week intensive camping program that includes group therapy and educational travel for groups of three counselors and ten children. Fifty girls will participate in this program during 1974. The girls are allowed to participate in the planning stages as well as the actual trip. The director of the camping program stated that this kind of active therapy was also effective with older and more sophisticated girls.

### J. Recreation: Boys' Institutions

It is essential, the expert witnesses agreed, for adolescent boys to have a legitimate outlet for aggression and hostility. Competitive athletics provide one such outlet. When such normal channels of expression are absent, anger is apt to express itself in fighting and other forms of aggression. Unexpressed hos-

tility may also cause boys to turn inward and contribute to depression or even suicidal tendencies. A repressive institution that discourages spontaneous physical activity by its students promotes unacceptable behavior. The irritations and physical confrontations intrinsic to the Gatesville and Mountain View dormitories are one result of the repressive nature of these institutions.

During the recreation periods at Gatesville—after school and in the evening when the boys are in their dormitories—the activities in which they are permitted to engage vary from correctional officer to correctional officer, depending upon the personal predilections of the officers, rather than upon the needs, interests and desires of the boys. For example, some of the correctional officers at Gatesville engage in outdoor sports with the boys and others will not.

The recreation program at Mountain View is also deficient. No adequate program exists for individual recreation, such as gymnastics, for those boys who are not proficient at team sports. Forms of recreation like movies, canteen privileges, and use of the gymnasium are very limited at Mountain View, except for the "office boys," who are permitted special privileges.

### K. Loss of Identity

The expert witnesses gave evidence that an adolescent must have a sense of identity—"the reflection of a man's own worthiness from other men" [Emerson]. Many delinquents, the expert witnesses testified, have a distorted sense of identity; they feel that they are bad—the outcasts and rejects of the community. The acquisition of a positive self-image is thus one of the primary tasks of adolescence. Since delinquents often have experienced coldness and rejection, a positive concept of a juvenile's self grows best in an atmosphere of warmth and regard. It follows that any practice

---

24. In this game, one girl crawls around on the floor and other girls pat her three times on the head and try to say "poor kitty" without laughing. Other required recreation includes "hot potato" and "musical chairs."

that diminishes self-respect is counter-therapeutic. Many of the customs at TYC institutions, as will be hereafter shown, are well calculated to diminish or destroy an adolescent's nascent self-concept and to hinder his personal search for identity.

Boys at Gatesville are allowed to wear their personal clothing at only a few of the seven subschools. Most are required to wear identical state-issued garments. It is obligatory that all of their personal possessions be kept in a box in the clothing room; the boys may have access to them only with permission. Only a Bible, and sometimes a radio, may be kept near their bunks. Boys are often referred to by their bunk number, and very seldom are they known by their first names. If one works in the kitchen, he is referred to, for example, as "big sink boy." The testimony of expert witnesses was to the effect that referring to a child in an impersonal manner is demoralizing and anti-rehabilitative, and, in effect, tells the boy that he is unworthy of having a separate personal identity.

Girls at Gainesville have been required to conform to a dress code that enforces the standards of the small rural community in which the school is located. In one dormitory at Gainesville, the only mirror (except for some belonging to girls who brought their own) is a small reflector made of metal that casts back a distorted image of the viewer. Black girls at Gainesville and Crockett are sometimes not permitted to wear their hair in certain styles, such as "Afros" and pom-poms. Thus, the girls' normal concerns with their appearance and urges to experiment with different styles of dress and hairdo are thwarted and discouraged. The girls at Brownwood, on the other hand, are encouraged to create their own dress code with the help of the staff.

### L. Lack of Opportunities for Socialization

None of the TYC institutions is coeducational. The students have rare contacts with their peers of the opposite sex, despite their typically lengthy periods of incarceration. Of the many students who testified at the trial, only one mentioned having ever participated in a coeducational activity, and he did so only the one time. At Crockett, the staff reported that the local community is too hostile to invite local boys into the institution for coeducational activities. At Crockett and Gainesville, male friends are rarely, if ever, allowed to visit girls.

It was the opinion of expert witnesses called by both plaintiffs and defendants that frequent and regular contact with members of the opposite sex is an absolutely necessary condition for normal healthy adolescent growth. The results of the absence of coeducational opportunities are serious; the juvenile does not learn to function in a heterosexual environment, and he or she is pushed into the expression of sexual drives by behavior such as homosexuality or rebellion.

At Gatesville and Mountain View, some boys have been dosed with psychotropic medications to suppress their sexual urges, which found no outlet in their environment. Any sexual experimentation, such as masturbation or exhibitionism (which the expert witnesses stated to be normal temporary adolescent behavior) is punished by the Gatesville staff as a manifestation of homosexuality. Yet the staff has apparently been unable to prevent serious exploitation of small or weak boys by aggressive, larger ones. The handling of true consensual homosexual contacts is also naive—the boy is told to "shape up," but allowed no counseling or opportunity to discuss the conflicting feelings and guilt that an incident may have aroused in him. No TYC institution offered any form of sex education or counseling.

As already mentioned, the staff at Mountain View, although untrained in any aspect of adolescent sexuality, was, until the entry of the emergency order, permitted to single out certain boys for placement in the "punk dorms"—two

dormitories, segregated by race, which housed not only active aggressive homosexuals, but also small or weak boys and boys with confused sexual identities. No expert witness even attempted to offer an excuse for this appalling practice, which was universally condemned by the experts.

In the girls' institutions, the staff is often so fearful about the possibility of homosexuality that it discourages any expression of affection or friendship between individual girls. Actions such as holding another girl's hand, borrowing her clothes, combing her hair, or sitting on her bed are punished. But expert witnesses stated that such gestures are almost the only way girls have to express feelings of attachment for others of their own age, confined as they are to the company of their own sex. Moreover, the experts were of the opinion that the staff fear of homosexuality makes it attractive as a form of rebellion; consequently, an "underground culture" with a special jargon and ritual has arisen at the girls' schools. The experts concluded that these phenomena are not indicative of true homosexuality, but are rather of the results of isolation and staff emphasis on abnormal behavior.

The expert witnesses, both plaintiffs' and defendants', agreed that coeducational institutions are vastly superior to sex-segregated ones in their rehabilitative possibilities. If coeducation is impossible, frequent and regular contacts between the sexes are an absolute necessity. An environment that makes no provision for coeducational activities cannot possibly satisfy the social and emotional needs of adolescents. The National Advisory Commission on Correctional Standards and Goals calls for conversion of all juvenile institutions to coeducational facilities, and expert witnesses testified that coeducation has become accepted as a norm for juvenile residential schools throughout the country.

## M. *Conclusions*

The testimony of expert witnesses leaves the court without a doubt that the milieu in which a juvenile lives is crucial to the rehabilitative process. No matter how well intentioned and professional a juvenile's treatment plan, it will be rendered worthless by an accumulation of daily indignities, discomforts, and harassments, such as were documented at the trial. Moreover, many of the practices described at trial force juveniles confined by the TYC to exist in an environment that is exceedingly deprived—psychologically, emotionally, and physically. Such senseless and arbitrary deprivations violate the juveniles' right to be confined under the least restrictive circumstances consistent with their rehabilitation. *See* Covington v. Harris, 136 U.S.App.D.C. 35, 419 F.2d 617 (1969); Lake v. Cameron, 124 U.S. App.D.C. 264, 364 F.2d 657 (1966). It is concluded that juveniles under the authority of the Texas Youth Council have a constitutional and statutory right to the following minimum elements of an adequate professional treatment plan:

1. Adequate case work services by an individual trained and experienced in the treatment of adolescents.

2. A physical plant designed to maximize the child's security, privacy, and dignity.

3. Freedom from unnecessary confinement in close quarters or restriction of legitimate activities.

4. Opportunity for adequate recreation and exercise and constructive and entertaining leisure time activities.

5. Freedom from unnecessary or arbitrary invasions of privacy.

6. An adequate, well-prepared, and well-served diet, supervised by a licensed dietician.

7. Opportunity for free communication with persons outside the institution by mail and telephone.

8. A coeducational living environment, except in the case of very small

facilities for one sex only, which must provide frequent and regular contacts with members of the opposite sex in a variety of settings.

9. The liberty to exercise freedom of choice in areas such as dress, hairstyle, choice of friends, and other personal matters.

10. An environment that permits the juvenile to express—either verbally or non-verbally—the emotions, such as anger, affection or unhappiness, that he may feel, unless the expression is harmful or destructive.

At this point, the court does not attempt to delimit more specifically the boundaries of the above rights. Such an attempt would be fruitless, since much must depend upon the nature of the child's living environment. A rule of conduct that may be entirely laudable in a group home for six children may be completely inappropriate in an institution for thirty; practices may be justified for an intensive care facility that are unacceptable in a halfway house.

Accordingly, the parties are directed to confer with the object of agreeing upon a detailed plan for the implementation of the above-defined rights of juveniles throughout the facilities of the Texas Youth Council.

## XII. MEDICAL AND PSYCHIATRIC CARE

### A. *Medical Care*

One of the important basic services that any acceptable residential facility must provide is adequate medical care. A medical expert testified that, at a minimum, one nurse should be on duty twenty-four hours a day, for each one hundred students in a residential institution, and that one physician per one hundred students should be on duty every day and on call at other times. Moreover, physicians, dentists, nurses and other medical personnel at institutions for adolescents should be specially trained in adolescent medicine.

The reality of medical care at TYC institutions is quite different from this standard. The Crockett nursing staff consists of one registered nurse, one licensed vocational (practical) nurse, and one attendant. A physician visits the institution only once each week and is on call at other times.

At Gainesville, a registered nurse is on duty each day during the week; at night and on weekends, only licensed vocational nurses are on duty. When the registered nurse is not on duty, the licensed vocational nurses decide whether a student's medical problem is urgent enough to require the attention of a medical doctor or a psychiatrist. One of the licensed vocational nurses at Gainesville, who has worked at the school for over three years, stated that she never found it necessary to call a psychiatrist for emergency treatment of a student.

There is only one registered nurse working at Mountain View, no licensed vocational nurses, and six infirmary aides. The aides have the status of correctional officers and do not necessarily have medical training. Nevertheless, the aides sometimes are called upon to decide whether to refer a student to the doctor when the nurse is not present. The nurse is not always on hand at "sick call," and is never present on Saturdays or Sundays. Only an infirmary aide is on duty during the night at the Mountain View infirmary, and students who are in the infirmary at night are normally confined in individual isolation rooms. The infirmary aide on duty is required to check these rooms hourly, but lights are not always turned on in the individual rooms. If no light is on, the student inside the room cannot be seen.

There is only one registered nurse at Gatesville Reception Center, and two registered nurses are assigned to the Gatesville infirmary. A registered nurse is not on duty at all times at either facility. When a registered nurse is not present (at night and on weekends), a licensed vocational nurse is on duty. The nurse on duty determines whether a student's medical problem requires the attention of a medical doctor. The nurs-

es are assisted by medically untrained male correctional officers, whose duties include checking any medical problem students might have in the genital area.

The TYC does not employ any full-time medical doctors. A medical doctor is employed to attend students at Crockett; he visits at least one day each week and is on call at all other times. A medical doctor affords treatment for the girls at Gainesville at least one day each week and is on call at all other times. At Gatesville, a medical doctor provides services three days each week. A physician visits Mountain View two days each week and is on call at all other times.

The inadequacy of medical care at the various institutions sometimes results in traumatic incidents for students. One student at Crockett testified, without contradiction, that she had been taking penicillin for tonsillitis. She attempted to escape from the school, and was placed in solitary confinement as a punishment. Thereafter, she started vomiting blood. The nurse who was called arrived more than an hour later, and the student neither saw a doctor nor received any medication after the incident. On another occasion at Crockett, a girl inhaled a substance in an aerosol container. Since no doctor or nurse was on duty, the untrained staff members drove her to a local hospital, where she subsequently died. One girl who had a miscarriage at Gainesville did not see a medical doctor until approximately two days after the event. There is little prenatal and no postpartum counseling for pregnant girls at Gainesville. Students from all institutions testified that they often were denied the opportunity to see the doctor. In particular, students who have sought medical care after having been struck or physically abused by TYC staff members have not always received such attention.

At Mountain View, the untrained infirmary aides examine students assigned to the solitary confinement section of the school. The nurse does not see them, although she, herself, testified that the aides are not qualified to do a physical examination of a boy to determine whether he is in condition to be placed in solitary confinement. The boys in solitary confinement are brought to the infirmary every morning to have their temperatures recorded, but the nurse is not present at that time; hence, she does not know whether temperatures are taken during the weekend.

### B. *Psychiatric Care*

The teaching of the expert witnesses was that psychiatric care is another essential service that must be provided by a minimally adequate intensive residential facility. Specialized help for students should be provided through the coordination of the efforts of psychologists, psychiatrists, caseworkers, and teachers. All should be acquainted with each child's day-to-day experiences and adjustment and be able to serve in a consultative capacity with the staff that works with the child. Expert witnesses stated that each student should participate in an intensive psychotherapy session at least three times weekly; if the session is a group session, it should be no larger than ten, with an optimal size of eight.

In a minimally adequate institution, experts testified, there should be one full-time psychiatrist for each one hundred students. Psychologists are also a necessary supporting service, without which neither psychiatric services nor casework services can be truly effective. A minimum standard is one psychologist with a Doctorate, and two with Master's degrees, for each one hundred students. Psychiatric nurses should also be available to assist the psychiatrists.

A psychiatrist is employed to visit at Crockett on Tuesdays and Thursdays every other week. At Gainesville, a psychiatrist is employed to visit one day each week, although in January of 1973 the psychiatrist came only one day every other week. Psychiatrists are employed at Gatesville only four man-days each week, despite the fact that there are more than 1,000 students at the school.

Brownwood has one part-time psychiatrist, who works two days each week at the school. A psychiatrist who practices in the town of Brownwood is on call for emergencies at other times. A psychiatrist is employed to come to Mountain View about one day each week.

There are no full-time psychiatrists employed by TYC. Because of the remoteness of the TYC institutions from the centers of population, it is difficult to recruit psychiatrists to work in those institutions. The only psychiatrist who works at Crockett and at Gainesville does not regularly visit the security treatment centers, the students' living quarters, or the academic school. He also has no involvement in staff in-service training programs and conceives his role not as that of a treatment program supervisor, but as a consultant to the TYC. Nevertheless, he makes no input into the design of treatment plans, development of new programs, or staff training, and he seeks no regular interaction with the houseparents or caseworkers. Moreover, he is not familiar with the program environment of his student patients. Rather than participating in program design and implementation, this psychiatrist spends most of his time checking on students' reactions to medication.

The psychiatrists at Gatesville never see students more than once a week on a regular basis. One of the psychiatrists at Gatesville sees only five or six boys on a regular, once-a-week basis; he sees some other boys solely for the purpose of determining their reactions to medication, for a maximum of ten minutes each. The Gatesville psychiatrists communicate orally with the caseworkers in only five per cent of the psychiatrists' cases, and rarely speak with school teachers. Thus, rather than devoting time to staff development, staff training, or treatment planning, the psychiatrists at the TYC schools see only a small number of the students and have meaningful therapeutic relationships with even fewer. Many children who

actively seek psychiatric help encounter delay or refusal.

### C. *Psychological Services*

Psychological services, like psychiatric care, are inadequate. Gainesville did not have the services of a full-time psychologist until January 1973. This psychologist is not licensed, and were the TYC not exempt from such requirements, he would be authorized in Texas to practice only under the direct supervision of a psychologist with a Doctorate. An expert witness testified that TYC psychologists do not have a thorough and adequate knowledge of the tests that they administer, and that their work priorities are determined by TYC administrative policy rather than by their evaluations of the needs of the children under their care.

### D. *Psychotropic Medication*

It was the collective opinion of expert witnesses that the use of psychotropic medication on institutionalized juveniles is extremely dangerous and should be subject to rigorous procedures. The major tranquilizers, such as Thorazine, should be prescribed, if at all, only for psychotic children. Drug therapy should be avoided, if at all possible, for juveniles who have histories of drug abuse, since it only reinforces their feeling that life's problems may be solved by ingestion of chemical substances. Children who do take drugs regularly require highly individualized diagnosis and supervision, to assure that the desired results are obtained and that side effects are not serious. The nurse responsible for dispensing or administering medication should be fully familiar with the drug's primary and side effects, and in-service training should seek to educate the staff in the properties of the various drugs. All child care workers who have contact with an individual who is taking psychotropic medication should be aware of the individual's drug and dosage. Major tranquilizers should not be misused as sleeping medication; less power-

ful drugs with fewer side effects are available.

At the TYC institutions, Thorazine and other mind-affecting drugs are often prescribed for juveniles, including juveniles who have not been diagnosed as psychotic and juveniles who have abused drugs in the past. For example, in the fall of 1972, about half of the students at Crockett were taking regular dosages of a psychotropic drug. One girl testified that she was given Quaalude, a powerful, dangerous, and often-abused drug, for pain in her back. The nurses who administer the drugs are often licensed vocational nurses rather than registered nurses, and have no expertise in the supervision of a course of powerful medication. At Mountain View, prescribed medication may be given by the nurse or by infirmary aides who have no medical training. Approximately sixty students were on medication at Mountain View in November of 1972, some receiving Thorazine. Students who are locked in the solitary confinement section at Mountain View are given their medication by the medically untrained infirmary aides, not by the nurse. At some time in 1972, the practice of supplying medication to the medically untrained houseparents for administration to students was discontinued at Gainesville.

One of the TYC psychiatrists occasionally leaves a standing order for the nurses that, with regard to specified students, intramuscular injections of psychotropic drugs may be given, if needed. At Mountain View, a medical doctor or psychiatrist may prescribe medication for a student "as needed." The nurse, or if she is not on duty, the medically untrained infirmary aide, decides whether the medication is needed by the student. This practice extends to intramuscular injections of medication, as well as medication to be taken orally.

At Gainesville, Thorazine and other drugs are regularly administered by the licensed vocational nurses when the registered nurse is not present. Such drugs are administered either orally or by injection. A physician's orders to administer these drugs are sometimes made to the licensed vocational nurses by telephone. One licensed vocational nurse at Gainesville admitted having administered Thorazine, by injection, to a student for whom there was no prescription. The nurse explained that she understood that she was permitted to do this if a student was "out of control." The nurse conceded that she had no training in the use of behavior modifying drugs and was unaware of any possible contraindications to the use of Thorazine.

Since psychotherapy is practically nonexistent at TYC institutions, drugs are often used as a substitute for a more appropriate form of treatment. One Gatesville inmate, for example, complained to the psychiatrist that he was having trouble sleeping. He was given medication to make him drowsy, but no inquiry was made into the possible causes of his insomnia, and he saw the psychiatrist only three times in a period of five months. In other cases, the scarcity of psychiatric staff may interfere with an established drug program. One TYC student was diagnosed as a manic-depressive at Brownwood Reception Center and Lithium was prescribed for her. She experienced a discontinuance of her dosage for the first twenty days she was at Gainesville, since the psychiatrist was not able to see her during that time.

The Chief of Mental Health and Psychiatric Services for the TYC (who is not certified by the American Board of Psychiatry and Neurology) has failed to institute any systematic procedure to inform TYC staff as to which students are on medication prescribed by psychiatrists. For example, the education counselor at Gainesville is not informed of which students are taking psychotropic drugs; neither are teachers in the academic school notified. Teachers sometimes learn for the first time that a student is receiving behavior modification drugs when the student becomes drowsy in class. Neither the educational coun-

selor nor the teachers are regularly informed of the potential side effects of the psychotropic drugs that the students may be taking. No written procedures or in-service training for houseparent staff to familiarize them with and prepare them for the side effects of phenothiazine (*e.g.*, Thorazine) medication is required. It is entirely possible that a student could experience serious side effects of which his houseparent or dormitory supervisor is entirely ignorant. Correctional officers at Gatesville, the members of the staff who have the most regular daily contact with students, are not informed of the nature of the drugs students may be receiving. This absence of coordination sometimes leads to the punishment of students who are taking sleep-inducing medication for the offense of falling asleep during the day.

### E. *Conclusions*

Two of the classic components of the "right to treatment" are adequate medical and psychiatric care and freedom from indiscriminate treatment. *See, e. g.*, Donaldson v. O'Connor, 493 F.2d 507 (5th Cir. 1974); Nelson v. Heyne, 491 F.2d 352 (7th Cir. 1974), cert. denied, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); Rouse v. Cameron, 125 U. S.App.D.C. 366, 373 F.2d 451 (1966); Wyatt v. Stickney, 344 F.Supp. 387 (M. D.Ala.1972) and 344 F.Supp. 373 (M.D. Ala.1972), enforcing 325 F.Supp. 781 (M.D.Ala.1971), appeal docketed sub nom. Wyatt v. Aderholt, No. 72–2634, 5th Cir. August 1, 1972.

 The court concludes that juveniles under the authority of the Texas Youth Council have a constitutional and statutory right to medical and psychiatric care that has been grossly violated and are entitled to care that conforms to the following minimally acceptable professional standards:

1. Adequate infirmary facilities, properly utilized.

2. Access to medical staff without delay or interference.

3. A psychiatric staff, consisting of psychiatrists certified by the American Board of Psychiatry and Neurology as qualified in the field of child psychiatry, sufficient in number to assure treatment of individual children who require individual therapy; effective training and supervision of other treatment staff; and coordination of treatment programs.

4. A psychological staff, to consist of psychologists holding either Master's degrees or Doctorates in psychology and experienced in work with adolescents, sufficient in number to meet the needs of the children.

5. Provision of either individual or group psychotherapy for every child for whom it is indicated.

6. Sufficient psychiatric nursing assistance.

7. Sufficient medical staff and nursing staff to provide effective preventive and curative care for the health of all juveniles.

8. Freedom from indiscriminate, unsupervised, unnecessary, or excessive medication, particularly psychotropic medication.

No attempt will be made at this time to prescribe more detailed standards for the implementation of these rights, since the parties, with the assistance of experts, should be able to agree upon minimally acceptable professional guidelines and sufficient safeguards to insure their enforcement. The court finds that a juvenile's constitutional and statutory right to medical care is at least equivalent to a right to care that meets minimal professional standards, and notes that there was substantial agreement among expert witnesses at trial with respect to professional criteria. *See* Nelson v. Heyne, *supra*, 491 F.2d at 357 n. 11; Wyatt v. Stickney, *supra* at 344 F. Supp. 383–384, 406; Note, 86 Harv.L. Rev. 1282, 1298 (1973).

## XIII. CASEWORK AND CHILD CARE

### A. *Houseparents and Correctional Officers*

At the girls' schools, cottages are supervised by houseparents. Boys' dormi-

tories are supervised by correctional officers. Matrons are present during the day in Gatesville dormitories, but there are no matrons at Mountain View. The juvenile in a TYC institution spends most of his waking time with the houseparent, correctional officer, or the staff member assigned to his or her dormitory. TYC personnel and expert witnesses for all parties agreed that the daily living staff is the backbone of any treatment program. There was a wealth of expert opinon concerning the selection and training of houseparents.

The expert witnesses unanimously agreed that houseparents and "dorm men" should provide a warm, accepting environment for juveniles, and that they should make the juveniles feel comfortable when talking to and confiding in them, even when expressing anger or other violent emotions. The expert witnesses also agreed that the adults should be trained to help the juveniles cope with their anxieties in a legitimate way. Adolescence is a time of changing moods and tensions, and adolescents must have an outlet for them. If a staff member handles outbursts of anger with demerits to the child, he shows a misunderstanding of the intensity of and sometimes legitimate causes for a child's anger and requires the child to suppress it. The practice also ignores the background from which the child may have come, where such expressions of anger are often permitted. If adolescents suppress the expression of their anger, experts testified, the results are disastrous. It may break out in what one expert called "a terrible violence" or it may make the child turn on himself and engage in self-destructive behavior.

Houseparents or correctional officers, minimally, should have a high school education. Some expert witnesses thought houseparents should have a minimum of two years of college training, because of their prime importance in the treatment process. Others believed that houseparents should have "demonstrated their interest . . . by pursuing some training . . . like child development, child psychopathology . . . and some understanding of family structure. . . ." In Massachusetts' community-based facilities, the same person is often the houseparent and the counselor, and usually holds a Bachelor's degree.

Adolescents who have been involved in delinquency need more staff "role models" than normal adolescents, in order to help them develop a positive self-image and identity. Most delinquents come from chaotic backgrounds and have not had appropriate role models in their own families. The expert witnesses testified that fatherless boys particularly need adult male role models.

Juveniles of both sexes should be exposed to both male and female staff members. It is important that juveniles in a residential facility be in contact with the same variety of ages, sexes, and races that they will later encounter in the outside world. Furthermore, the staff should reflect the ethnic and racial characteristics of the students. It is of great consequence that a juvenile, particlarly one from a minority group, see persons of his own race and ethnic background in positions of importance and status.

Because of the sensitivity of the role that houseparents and correctional officers play in the lives of juveniles, and because of the attraction, attested by several witnesses, that corrections work holds for "sick" people, it is essential to screen potential employees psychologically. The screening should scrutinize an applicant's personality and characteristics, to determine his suitability or nonsuitability for working with juveniles. Psychologically unsuitable job applicants can be screened out by psychological testing, psychiatric interviews, or interviews by a trained social worker. One of the defendants' expert witnesses cited the Cornell Selectee Index as such a screening instrument; another of the defendants' experts suggested that such screening be done by an expert personnel officer. Still another of the defendants'

expert witnesses explained that in the juvenile institution of which she was the superintendent, such personality screening was done "because we don't want a person coming in who is very rigid, who can't understand different types of behavior, who can't take aggressive, and sometimes bad language from the individuals they are working with. . . ." One of the TYC's psychological consultants testified that "there are psychological instruments that are indicative of a person prone to be impulsive or to have a low frustration tolerance. . . ."

Dwain Place, the Superintendent of Gatesville, and the Acting Superintendent since 1971, holds a Bachelor of Arts degree in Business Administration, but had no prior experience in the juvenile field before his employment by the TYC. Paul Bromser, presently Unit Superintendent of the Riverside Subschool at GSSB, was hired originally as a caseworker, even though he did not have a college degree. He was later promoted to his present position as Unit Superintendent, although he still did not possess such a degree. The entire staffing structure of Gatesville is riddled with such underqualified or unqualified individuals.

At Gainesville, houseparents must have a high school education and "some knowledge of child care." Applicants are interviewed and their references checked. Their in-service training consists solely of on-the-job observation and occasional lectures. The Superintendent at Crockett did not know whether all of the houseparents at the institution have a high school education. At Gainesville, one houseparent supervisor does not have a high school education, even though state law requires a high school degree or its equivalent from one in that job classification. As already mentioned, correctional officers at Mountain View are hired without testing. They generally lack any character of prior experience in working with juveniles, and many hold full-time jobs elsewhere, in addition to their jobs at the institution.

Both the expert observers and juveniles testified to the role of child care workers in the TYC. Their testimony established that, at Gainesville, houseparents play essentially a guard role, i. e., they do not initiate contact with the girls; their principal function is to watch the girls; and they perform no treatment role. What behavior or actions are acceptable within each cottage depends on the particular tolerance level of the housemother in question. The housemothers discourage girls from expressing feelings of anxiety, sadness, or anger, even when those emotions are understandable and appropriate. The expert observers noted that the houseparents resort to platitudes in conversing with the girls instead of acknowledging their negative feelings; that their conception of an ideal inmate appears to be that of the quiet, docile and passive girl. It was also noted that the Gainesville staff apparently has no conception of how their behavior affects the girls or how changes in rules or policies might provoke various responses in their charges. In addition, the housemothers' low tolerance for spontaneity and, through lack of training, their inability to calm girls by counseling or other informal methods result in overuse of isolation as a method of maintaining control.

Testimony by juveniles at the girls' institutions also reflected their conception of the houseparent as chiefly a disciplinarian: one who makes often arbitrary rules, gives reports, takes away privileges (such as smoking or recreation), and who sometimes sends girls to the STC. The girls at Gainesville and Crockett thus do not regard their houseparents as trusted confidants or helpers to turn to for counseling or assistance. These girls feel that they are allowed no outlet for their hostility or anger; instead, they are given demerits for trivial misconduct such as "laughing while at the table."

The Regulations for Houseparents at Gainesville mandate that the housepar-

ent permit only one activity at a time, *i. e.*, television or table games; that she not enter a girl's room when the girl is in it; that she not open a girl's door after 9:30 o'clock p.m., unless a man is present; and that the chain always be latched when a girl is in her room. Expert witnesses testified that these regulations were poorly conceived for several reasons. First, they suggest to houseparents that they have something to fear from the girls. The girls, in turn, detect the houseparents' anxieties and react to their intuitions that the adults around them are insecure and afraid of them. Moreover, the rules suggest to the girls that men are called into their lives only to take physical control of or to punish them.

The correctional officers at Gatesville also act generally in the manner of guards, merely observing the children rather than becoming involved with them. One witness testified that they project an image of "machismo" and are without any impression of tenderness, warmth, or sympathy. Their primary, perhaps only, function is control. The correctional officers at both Gatesville and Mountain View wear uniforms, and thereby reinforce the boys' impressions that they are practitioners of containment or punishment rather than rehabilitation. This, in turn, confirms the boys' belief that they are being punished.

At Gatesville, recruiting for staff is done primarily by referrals from other staff. Employees tend to be former military personnel with no prior juvenile experience or men from the community looking for a second job. Many of the boys from Gatesville come from urban settings. The largely rural staff members do not empathize with or are not familiar with the boys' backgrounds, although it is important for treatment personnel to understand the environment from which the boys come and to which they will return.

No active effort is made to recruit Blacks or Mexican Americans. Because of the geographic location of its institutions, TYC would encounter difficulty recruiting Black and Mexican American employees in any event. There are ten Mexican American houseparents at Brownwood, but none at Gainesville or Crockett. The racial imbalance on the staff is particularly apparent when consideration is given to the fact that thirty-four and one-tenth per cent of TYC students are Black; forty-one and nine-tenths per cent are Anglo; and twenty-three and nine-tenths per cent are Mexican American. An analysis of the total TYC staff shows that thirteen and seven-tenths per cent are Black, eighty-three and five-tenths per cent are Anglo, and two and five-tenths per cent are Mexican American. Of the boys at Mountain View, sixty-eight and seven-tenths per cent are Black or Mexican American, and eleven and four-tenths per cent of the staff are non-Anglo. At Gatesville, sixty-one per cent of the boys and fourteen and three-tenths per cent of the staff are Black or Mexican American.

Among the subschools at Gatesville, the proportions of the ethnic mix vary widely. At Valley School, forty-three per cent of the boys are Black and thirty-nine per cent Mexican American, with a staff which is eighty-one per cent Anglo. At Sycamore (the elite school with an accredited high school), seventy-nine per cent of the students and eighty-six per cent of the staff are Anglo. At each of the girls' schools, the proportion of non-Anglo girls is roughly the same —about thirty-five to forty-five per cent. The staff at Crockett (which was once a segregated school for Black girls) is fifty-five and two-tenths per cent Black and Mexican American. At Brownwood, the staff is twelve and six-tenths per cent non-Anglo; and at Gainesville, it is only six and nine-tenths per cent minority. At Mountain View, there are ninety-two Anglo custodial staff, eleven Blacks, and three Mexican Americans. At Gatesville, 212 Anglos, forty-eight Blacks, and six Mexican Americans are on the custodial staff. At Brownwood, there are eighty Anglo,

twelve Black, and five Mexican American houseparents.

There is no psychological screening of potential employees at Gainesville or Brownwood. The Superintendent of Gainesville testified that he was under the impression that he was prohibited by law from using psychological tests for employees, although he had never asked for a legal opinion on the subject from the State Attorney General. He was not familiar with Department of Labor or Equal Employment Opportunity Act regulations on the subject of reasonably related job testing. He conceded, however, that such testing would be helpful in selecting employees. The Clinical Director at Brownwood thought that a role-playing test might be feasible for screening out unsuitable persons. ·

Prospective employees at Mountain View are interviewed by a correctional officer supervisor, the Superintendent and Assistant Superintendent; if their references appear in order, they are hired. No psychiatric or psychological screening is done, as previously mentioned, nor is an investigation made to determine if the new employee has a criminal record. Former employees at Mountain View testified that they were interviewed by the Superintendent and Assistant Superintendent for a half hour or less and hired on the spot. They learned of the jobs from local newspaper advertisements or from friends. An employee is evaluated on the basis of casual references by the superintendent and the reports of the supervisors. Boys are never asked for their impressions.

The TYC's expert on psychological testing had never been approached by TYC officials as to the feasibility of such testing of job applicants. He suggested the appropriateness of the Rorschach test and the Cattell Sixteen personality factor test as indicators of a propensity toward violence or sadism.

These tests are already being used on students at Gatesville, and there are psychologists at the Reception Center who know how to administer them, but they have never been used on prospective staff members. In 1972, however, eleven staff members were discharged from Gatesville for use of excessive force against juveniles, and six employees were discharged from Mountain View for the same reason. The extensive testimony at this trial amply demonstrates that there were numerous other instances in which employees at Gatesville and Mountain View physically abused juveniles.

### B. *Training of Staff Employees*

It was particularly emphasized by nearly all of the experts who testified that careful training of all staff, especially those who have the most regular and intimate contact with the juveniles, is a paramount necessity. In-service training of houseparents and correctional officers is indispensable. This should include training in the techniques of handling a juvenile and understanding his juvenile behavior. Such training should also lead to the staff's comprehension of the effect of their demeanor and actions on the juveniles, and to their analyzing the behavioral effect on themselves of the juveniles' actions. The houseparents should receive a thorough orientation in the history, purpose, and goals of the facility or program, as well as training in principles of child development and child psychopathology. In addition, they must have adequate on-the-job supervision by individuals trained and qualified to deal with crimes or extraordinary situations. Minimally, houseparents should have *both* pre-job training and in-service training and supervision.[25]

Proper in-service training for a new staff member who will have contact with disturbed adolescents should take three

25. The Texas Department of Public Welfare's Standards for Child Care Institutions requires a "written plan for recruitment and

in-service training for all staff working with children."

or four months, with further in-service training required beyond that point. Initially, child care workers need a minimum of thirty hours of sensitivity training, augmented by ten per cent of their working time for training and consultation.

At best, pre-service training for houseparents and correctional officers at TYC facilities consists of several hours of lectures and one or two weeks of on-the-job training. In-service training occurs only when funds are available. The Sam Houston Institute for Contemporary Corrections ran sporadic in-service training for TYC staff between 1968 and 1972. In 1972, all such training was discontinued because of "turmoil within the staff from . . . hearings and investigations," according to the program's director. In 1968 and 1970, a program was run for about seventy-five staff members at Gainesville. The director admitted that "the training job is just beginning." In 1968 or 1969, one-semester courses were run for Crockett employees and for Mountain View correctional officers.

Beginning in January 1973, a psychological associate set up a six-week orientation program for new employees at Gainesville. A class in juvenile delinquency was instituted for permanent staff members. The class was taught by a visiting lecturer from Cooke County Junior College, and was concededly "on a somewhat elementary level." The staff member who set up the orientation program referred to in-service training at Gainesville as "far inadequate."

What passes for training in TYC institutions often is worse than worthless, because it consists of rigid or meaningless instructions that the employees do not understand and which they misapply. For example, an in-service training memorandum for Gainesville houseparents on "Delinquent Group Culture" warned them to "do nothing which will enhance the position of the leader." This mandate was interpreted by houseparents as a directive to discourage any show of leadership or ability by a girl.

New or modified policies affecting girls, as with changes in visitation or correspondence rules, are not given in written form to houseparents. Instead, they are transmitted orally through houseparent supervisors who meet with the superintendent. As a result, houseparents often obtain different impressions of what the current rules are and enforce them differently.

The "model" school, Brownwood, conducts an in-service training program for houseparents. Lectures discuss working with Mexican American children, drug abuse, normal adolescent behavior, family therapy, and discipline techniques. No explanation was offered as to why this type of training has not been made available at other schools.

At Gatesville, training for new correctional officers consists exclusively of having them sit in dormitories and watch other correctional officers at work. They are also provided with a booklet entitled "Manual for Control." At the time of trial, there were no ongoing in-service training programs at Gatesville. As previously shown, correctional officers at Mountain View 'confirmed that they were put on the job with no prior training. Aside from the handbook, which informed the officers that force could be used on a boy who was "out of control," they received no instruction as to when to use force. There was no elucidation of what "out of control" meant. Before being given complete supervision over a dormitory of boys, they were told to learn by watching the correctional officers with whom they "floated" for the first week or so. Different officers with whom new correctional officers trained taught them variant and discrepant techniques in handling misbehaving boys and divergent standards of conduct to insist upon. New men were sometimes told that they were not "hard enough on the boys," threatened with the loss of their jobs if they were not "tougher," and congratulated by their supervisors when they did use force. New correctional officers were specifically directed not to play

games with the boys or to let boys call them by their first names. They were also discouraged from developing close acquaintance with boys under their supervision and from mutual discussion of the boys' problems.

The evidence disclosed an almost complete mistrust of correctional officers by the boys in their custody, and a consequent lack of respect for the law that pervades the entire institution. It is, in the words of one witness, a system "built on more muscle than education or ability to lead or administer." Considering the actions of some correctional officers, such an attitude is understandable. New boys are called "fresh fish" by staff, "tested" to see if they can take physical abuse from the staff, given degrading tasks such as cleaning toilets by hand rags and performing late night shoe shines for staff members, called humiliating names by persons on the staff (such as "slut" or "punk"), and generally indoctrinated into a callous "tough guy" subculture. It is never suggested to the boys that they can turn to correctional officers for help for personal problems or for protection from assaults or intimidation by other boys. The correctional officers' odious practice of cultivating "snitchers" or informers also does much to increase the boys' mistrust of them.

### C. Staff-Student Ratios for Houseparents and Correctional Officers

Expert witnesses agreed that any minimal treatment program must be sufficiently well staffed to attend to the individual needs of every incarcerated adolescent. They expressed varying opinions as to the minimally adequate ratio of houseparents or correctional officers to inmates, ranging between one to six and one to twelve.[26]

At Gatesville, a correctional officer is required to supervise thirty to forty boys, making it impossible for him to treat them individually. As a result, the correctional officer necessarily takes on a "guard" or control function. At Gainesville, each cottage has two units, housing thirty to thirty-five girls, but has only two houseparents. A twenty per cent houseparent turnover, annually, at Gainesville and a fifty-two per cent turnover among correctional officers at Mountain View compounds the problem.

### D. Casework Services and Counseling

There was much expert opinion expressed on the utilization of casework services, and the following discussion represents this court's findings as to the preponderance of this evidence:

An adequate treatment program requires a sufficient quantity of professionally trained staff, preferably with skill and warmth in dealing with troubled youngsters on a close and individual basis. Caseworkers should serve in a coordinating role with other staff members, such as correctional officers, school personnel, and vocational training personnel. In the words of one expert witness, the caseworker should be "the person who interprets and elicits the support and assistance of all the other people in that program, which requires considerable time with the child care personnel, school personnel and others . . . he would be a coordinator of all those services in terms of rehabilitation, so that everybody is understanding the kid and working towards the same goals with him." Adequate casework is most critical when a child first comes to the institution. One expert witness testified that a good social worker "meets the bus" and showers attention upon the juvenile during the earliest period of his commitment. Caseworkers should keep in each juvenile's file a periodic progress report. (These reports are essential as a therapeutic tool since they dis-

---

26. The Child Welfare League's ratio of child care workers to students is one to six. The Texas State Department of Public Welfare employs a minimum standard for child care institutions of one to eight for children over age five. In the Maple Lane facility for girls in Washington, whose director was a witness for the TYC, a one to four group counselor-student ratio is maintained.

close the treatment plan for the child and the progress he has made, if any. The reports also serve to educate others who work with the child.) Finally, a child having problems in his relations with a houseparent or teacher should be able to obtain the caseworker's help in expressing and resolving his negative feelings.

Minimally, a social worker in a juvenile facility should have a Bachelor of Arts degree in social work or psychology. One expert witness' opinion was that, in the light of the multi-faceted problems of the girls at Gainesville and Crockett, it is preferable that all caseworkers there should be "MSWs," noting that caseworkers at Maple Lane in Washington all have such degrees. Additionally, it is important that individuals of all races and backgrounds be represented among the ranks of caseworkers, giving a minority child the option to communicate with a person who understands such of his problems as relate to ethnic characteristics and discrimination.

It was stressed by the expert witnesses that caseworkers should meet frequently among themselves to discuss their own feelings and how to cope with them, particularly as they relate to the children's needs. Caseworkers must be closely supervised by an individual having a Master of Social Work degree. Individual case supervision may be shared by a psychologist or a psychiatrist, as well as by one having a MSW degree. Each casework supervisor should have four to five years' experience in social work and administrative experience, as well as a familiarity with community facilities and resources. A maximum of eight social workers should be placed under the charge of a supervisor. A minimum of ten per cent of a caseworker's time on the job (four hours a week) should be spent in in-service training and consultation with supervisors. Adequate casework supervision requires that the caseworkers meet with the supervisor at least weekly for one hour to discuss problem cases.

Several expert witnesses testified that institutional caseworkers should carry caseloads of no more than twenty. The National Council on Crime and Delinquency publication, "Standards and Guides for the Detention of Children and Youth," sets a ratio of one-to-twenty youths. One of the defendants' expert witnesses, Dr. Goodrich, testified that at Maple Lane School for Girls in Washington, the caseload for a caseworker is sixteen. Brownwood's Clinical Director and Chief of Social Work Services also testified that a one-to-twenty ratio is desirable. The only expert witness that testified as to a higher permissible caseload was Howard Ohmart, basing his one-to-thirty-ratio on the recommendation of the National Crime Commission in 1967. Mr. Ohmart felt that if the facility or program was in the community, the ratio should be one-to-twenty. The ideal is a ratio which permits individual group therapy sessions, coordination with other staff who work with the student, and important family and community contacts by the caseworker.

Dr. Jerome Miller cautioned that staff-student ratios cannot be set in a vacuum. They may vary depending upon the tasks assigned to the caseworker, the system in which he operates, and the expectations of what he is to accomplish. Dr. Miller expressed the opinion that, at Mountain View, even a caseworkers ratio of one-to-five would accomplish little, because of the hostility to humane treatment that is an intrinsic part of its institutional climate.

Expert witnesses agreed that most children are not aware of the potential uses of a caseworker and will not initiate a contact. Caseworkers should, therefore, actively seek out and initiate contact with their clients in dormitories and elsewhere, not merely be available for interviews in their offices. Moreover, caseworkers should work during afternoons and until the juveniles' bedtimes, so as to maximize their time with their clients. Each juvenile should be seen at least weekly, to plan his goals,

review his progress, and plan toward his ultimate discharge. The conferences should be more frequent, if there is a crisis in a child's life. Conferences should be significant and not mere fleeting contacts.

The record discloses the many handicaps under which the casework staff at most TYC institutions labor: poor qualifications, lack of supervision, and excessive caseloads. Not surprisingly, the experts who analyzed these services concluded that they were seriously inadequate, even worthless. At the time of trial there was only one caseworker at Gainesville with a Master's degree. Others had college degrees, but often in subjects unrelated to social work. None of the caseworkers at Mountain View had any formal training in group work. Nevertheless, they sought to conduct ten to twelve therapy groups of from five to six boys each. Caseworkers at Gatesville have only a Bachelor's degree in some field, without any social work training or experience. No caseworker with a Master's degree in social work was employed in any of the seven subschools of Gatesville. At Brownwood, by contrast, one social worker has a Bachelor of Arts degree, two have MSW degrees, and one holds a Master's degree in guidance and counseling.

No Mexican American caseworkers are on duty at Crockett, Gatesville, or Mountain View. Three are at Brownwood, one (temporary) at Gainesville, and one at Giddings. Two Black caseworkers are employed at Crockett, three at Gatesville, one at Mountain View, one at Brownwood, and one at Gainesville.

In-service training for staff members does not exist at Gatesville, nor is any person assigned responsibility for staff training. The caseworkers do not meet weekly with their supervisors. Some casework staff are pursuing degrees in criminology from Sam Houston State University, which has a loose affiliation with the TYC through its Institute of Contemporary Corrections. There was testimony from the expert witnesses that training in criminology is not appropriate for an individual who works with juveniles as a social worker.

Caseworkers do not receive supervision from a social work supervisor with a Master's degree in any of the institutions. The caseworker supervisor at Mountain View has a Bachelor's degree in education and thirty hours of behavioral science from Sam Houston Institute of Contemporary Corrections, but has taken no courses in social work. The casework supervisor at Gainesville has a Master's degree in guidance and counseling but likewise has no degree in social work. There was expert opinion, moreover, that a ratio of one supervisor to four caseworkers with a B.A. degree would be inadequate at Gainesville, in view of the troubled population of girls.

The position classification plan for the TYC sets the education requirement for the position of Caseworker III (casework supervisor) as a "Master's degree from a graduate school of social work accredited by the Council on Social Work Education." In June 1973, the position of Chief of Casework Services became vacant at the Gatesville Reception Center. Despite the availability of other candidates with a MSW degree, the person employed did not have this educational requirement.

The person serving as casework supervisor at each of the seven subschools at Gatesville does not have a MSW degree. Other Gatesville supervisors have, respectively, degrees in the following fields: physical education, social science and English, Bible, and geology. The Gatesville Superintendent testified that he could not find any persons having MSW degrees to fill the casework supervisor positions.

The caseworkers at the several institutions have the following caseloads: twenty-five to thirty-five girls at

Gainesville; at Crockett,[27] thirty to forty girls; at Brownwood, twenty to twenty-five girls; at Gatesville, forty to fifty-five boys; and at Mountain View, forty to fifty boys. Such assignments, except for Brownwood's, render actual rehabilitative services virtually impossible.

Caseworkers in Gainesville have offices in the dormitories to which they are assigned, but they are available to girls only one evening a week and about an hour a day after school. In Crockett, caseworkers have their offices in the Main Administration Building, where they work from 8:00 a. m. to 5:00 o'clock p. m., five days a week. Newly arrived girls at Gainesville do not see their social worker for several days. Afterwards, they have the opportunity to see their social worker only at monthly intervals, except for three-month reviews. In nine months, one girl had two separate social workers and had seen them jointly a total of six or seven times. Crockett girls see their caseworkers only once a month, and often not for weeks after admission. Caseworkers do not initiate contacts, but wait passively for a student to request an appointment. One girl sought to see her caseworker because of homesickness, but by the time the caseworker could see her, three weeks had passed. In the interval, the girl had run away, had been apprehended, and was in isolation. Another testified that she once had to wait three weeks after a request to see her caseworker.

Caseworkers at Mountain View are assigned to dormitories but maintain their offices in the Main Administration Building. They work from 9:00 a. m. to 5:00 o'clock p. m., five days a week, and on occasional weekends. A boy at Mountain View usually sees his caseworker no more often than once a month. An expert witness who was an observer testified that, because of such limited contact, "there was really nothing in the way of a therapeutic relationship between the two of them." Yet at Brownwood, social workers have individually scheduled sessions every week or week and a half.

The casework staff at TYC institutions does not make a practice of meeting regularly with houseparents, teachers, or other staff, to coordinate their joint efforts to rehabilitate the children in their charge. Nor, as previously observed, do the houseparents and teachers regularly consult the caseworkers' files on children to educate themselves in various aspects of a child's history and personality. In fact, an observer at Gainesville noted that the caseworkers did not keep updated progress reports in children's files—the records contained only reports of Review Committee decisions—and any notes that the social worker made with respect to the child's case were kept separately in her own office, unavailable to others.

The expert witnesses' evaluations of casework at TYC institutions were uniformly negative, except for Brownwood. One stated that the social work staffs at Gainesville and Crockett do not exhibit sufficient sensitivity to the needs and behavior of the girls they are working with or to the backgrounds from which they come. Another expert witness testified that the staff at Crockett was overworked and inadequately trained; that they had little or no grasp of the problems of the girls they worked with; that their knowledge of personality and behavior diagnosis was extremely limited; and that their notions of treatment were rudimentary at best. A participant observer noted that caseworkers at Gainesville exhibit little understanding of adolescent girls, and that they have over-simplified views of and reactions to the girls. On illustration of the so-

---

27. Despite the heavy casework loads at Crockett, a social worker was assigned to stay for several months in the hospital at Galveston with a girl who had her arm amputated. This duty resulted in a loss of one-third of the total social work staff. during that time.

cial workers' lack of understanding is their failure to understand why—because of real anxieties—girls about to be released "act out" and even run away shortly before release. At such a time, an expert witness testified, a caseworker should counsel with the girl and assure her that it is normal to have fears about returning home. Instead, the staff interprets such a pre-release fluctuation in behavior as evidence that a girl likes the institution so much she wishes to remain there.

Dr. Gisela Konopka, an eminent authority in the field of social work, testified that she observed little warmth and affection from Gainesville staff toward girls.[28] Nor does the casework staff help the girls deal with the problems of adolescence. Most caseworkers have no discussions with the girls about drugs, sex, or homosexuality. And no girl sees the caseworker as her advocate. Rather, the girls perceive that their caseworkers are not available when needed, that they support the other staff unwaveringly in any cases of disputes with students, and that they do not understand the girls' problems.

Very little in the way of counseling or casework services is provided at Gatesville. Boys see their caseworkers once a month, if that often. There is no therapeutic relationship between the caseworker and the child. Caseworkers at Gatesville fail in their functions, because the caseloads are too high; the contacts between the boys and the counselors are thus too infrequent. (Caseworkers are forced to spend too much time on paper work, often as many as six hours out of an eight-hour day.) An expert witness testified that caseworkers at the Gatesville schools are not qualified to perform such counseling as is done, nor are they supervised by qualified persons.

Juveniles from Gatesville testified that when they report abuse by correctional officers to their caseworkers, nothing happens. Consequently, they do not file incident reports about abuse by correctional officers, fearing that they will receive no protection from retaliation. Gatesville boys who testified remarked on the absence of any group therapy and of the lack of anybody to go to when they become angry or have other problems. Since their caseworkers never seek them out, they feel they have no recourse but to maintain a "low profile" and keep quiet.

Juveniles from Mountain View also feel that they cannot look to their caseworkers or supervisors for any protection from the brutality of correctional officers in their dormitories. Those who tell their caseworkers of the beatings see no results. Others are deterred because caseworkers inform correctional officers when boys complain of abuse at their hands. Caseworkers do not act as advocates for Mountain View boys appearing before the release committee at STC.

The overwhelming preponderance of the evidence points to an inescapable conclusion: caseworkers throughout TYC institutions are not capable of doing their assigned tasks, have inadequate knowledge of the modalities of treatment and the dynamics of adolescent behavior, and do not receive adequate supervision or in-service training.

E. *Absence of any Family Involvement in Treatment*

Expert witnesses were in entire agreement as to the vital importance of involving the juvenile's family in his treatment. An adolescent must be evaluated in the context of his family and peers, *not in isolation.* Very often the alleged apathy of a family toward a child

---

28. Dr. Konopka commented on a girl whose file indicated that she was quite disturbed, and who had often been in STC. The girl agreed to a "contract" with the following terms: "I will always be in the last room at the end of the hall, so I only have one neighbor; I will be the last one called out to the toilet." Another provision was, "I will always walk with the housemother." Dr. Konopka testified that such an "agreement" was destructive of the girl's dignity and responsibility.

in trouble is furthered by the state's policy of ignoring the family throughout the treatment process and breaking up the family, so that the members reach their adjustments separately, and reintegration becomes difficult. Howard Ohmart testified, "For any kind of . . . treatment revolving around children, I don't think that the parents can be ignored or should ever be ignored. You . . . have to involve them in any way you can." Dr. Baxter testified, "In order to provide a truly rehabilitative and therapeutic program there would need to be real therapy and real counseling . . . not only for the boy, but for his family . . . a real attempt to reintegrate the boy . . . with his family and with the community." [29] At Gainesville, for example, out of the 195 admissions in 1972, all but thirty-one were living with families or relatives before admission. The majority of girls left within one year, and out of 215 releases recorded in the 1972 TYC Annual Report, all but fifty-nine girls returned to live with families or relatives. Clearly, ignoring the family is virtually certain to insure the failure of a treatment program, however effective it may be in other respects.

Thus, recent developments in the theory and practice of social work stress treating a family as a whole instead of working separately with the child and with the parents. The entire family should be seen together initially, in order that the social worker may observe their interactions and diagnose unhealthy patterns that may be motivating the adolescent's behavior. Often the members of the family do not recognize these patterns and do not know how to change them without professional intervention. Moreover, it is not enough for only the social worker to speak with the members of a family when they come to the institution to visit with the incarcerated child—this should be the time when the psychologists, and even psychiatrists, also discuss the child with his family and plan his future.

Families are important to the emotional needs of institutionalized juveniles, regardless of how badly they have been treated by their families. Adolescents react negatively to the denigration of their parents, i. e., to staff saying that they, the adolescents, "come from such a bad background"; such characterizations diminish their self-respect.[30] A child's family is important even if, perhaps especially if, it has not been helpful to him. Expert witnesses also explained that it is especially vital for a Mexican American child to have a continuing contact with his family. When he is living most of the time in a culture that provides no role models for him, his family and friends provide psychological support.

Expert witnesses testified that a juvenile facility should be no more than an hour's drive by public transportation from the juvenile's family home, which permits local contacts, frequent family visits, and the feeling that the juvenile is still a part of the family. Most of the inmates in TYC institutions are from lower socio-economic classes, and their families cannot afford the expense of visits to the often remote facilities where their child is confined. One former student at Gainesville, whose home was distant, said that during her

29. The American Psychiatric Association's Standards for Psychiatric Facilities Serving Children and Adolescents" prescribes: "All mental health program planning for children must take into account the central nature of their relationship to their family, parents, or parent substitutes." A principle of the American Psychiatric Association Standards also says: "The facility should be readily available, easily accessible and appropriately planned to give care of the children and family it serves. Generally, it should be near or easily accessible to the families of its patients, their schools and other agencies involved in the total mental health effort."

30. In one survey of youngsters in an institution, it was asked: "What do you dislike most about the people who have power over you?" The most frequent answer was, "The staff talks badly about my parents."

entire one and one-half year stay, she had been visited by her brother only once and by her father not all. A Mexican American girl at Gainesville testified that her parents could visit only once, because they lived in El Paso, almost 600 miles away. According to Gainesville's superintendent, only about thirty to forty per cent of the girls there have visitors during their stay.

Visitation by friends and relatives other than immediate family is also discouraged by requirements that both parents and institution approve any such visitors. There was evidence that visits from age-mates from the outside community are rarely allowed, although expert witnesses said that such visits would be rehabilitative. All of the difficulties relating to visitation contribute to the virtual absence of any form of family-centered therapy or counseling by TYC social workers.

When Gainesville had 390 girls, one Sunday a month was designated as a visiting day "because of numbers, more or less." With present reduced population, that reason lost its significance, and girls could have visitors during the week. Limitations on visiting days are a significant hardship for many families, especially poor families. Visitation procedures at Brownwood and Giddings are much more liberal. Approved visitors may visit for any number of times during the month. A sample survey at Brownwood showed that there were twenty-four conferences a month between caseworkers and visiting families of juveniles. About seventy-four of these conferences took place during a three-month period. During that time, there were a total of 157 visits to girls, and a total of eighty-three out of 100 were visited at least once during those three months.

Each of the subschools at Gatesville sets aside one Sunday each month during which the caseworkers are required to be on duty. The parents of the students are informed of this fact, so that they may visit the students when the caseworkers are present. Although it is only on that one Sunday that parents are encouraged to visit students, merely a few take advantage of the opportunity. One Gatesville student had seen his parents only once during his stay in Gatesville—they lived 700 miles away.

It is apparent that no attempt is made at Gatesville to counsel with the boys' families for the purpose of accomplishing their successful reintegration into family life. Social workers stay at the institution on visiting Sundays, but they do not make any attempt to visit among the families present; instead, they wait for the families to communicate with them. Although no family therapy is attempted at Gatesville, an expert witness testified that this would have been the treatment of choice in a substantial number of cases.

It was also stressed by the expert witnesses that a home furlough program is an important component of treatment. Furloughs should be available throughout a juvenile's commitment. If parents are not available, a juvenile should be furloughed to a friend's or community sponsor's home. Furloughs allow a child to learn about family relationships and develop in him a sense of responsibility while outside the facility; moreover, the child can learn for himself whether he is ready for release.

No non-emergency furlough procedures are extant for Gatesville or Mountain View boys. Until recently, the policy was that a girl at Crockett or Gainesville was eligible for a home furlough only after nine months, irrespective of any individual factors. This policy was recently revised at Gainesville. But excepting emergency situations, a girl at Gainesville is not allowed to visit her home, if she does not have the necessary funds.

Furlough procedures at Brownwood are unique in the TYC system. A girl at Brownwood may earn a furlough at any time; there is no minimum waiting period. Girls who live near the school may take monthly furloughs. Visits are financed by the parents or from the

school benefit fund. Furlough requests are investigated and approved by the parole officer. The Brownwood clinical director stated that he would prefer to have caseworkers visit the homes of those girls who go home on furloughs, in order to evaluate the readiness of the girl for release to her family; however, as the situation now exists, the caseworkers can learn only from the girl about her experiences on furlough.

In this connection, it is significant that parole officers do not participate in any type of family therapy, not only because they do not have the training required, but also by reason of the fact that their caseloads are too large for them to meet with individual families.

### F. *Absence of Group or Other Cohesive Program Therapy*

A form of so-called "reality therapy" is practiced in TYC institutions. The expert witnesses explained that reality therapy requires that the therapist not concentrate on the part of the juvenile's past which brought him to the institution; rather, the therapist should focus on changing the juvenile's present behavior. As practiced by TYC personnel, reality therapy consists of confronting the juvenile with his undesirable behavior and making him admit that it is self-defeating. Dr. Quay, an outstanding expert in the field, explained that the style of "reality therapy" practiced at Gainesville is thus very different from the concept developed by its founder, William Glasser. At Brownwood, however, reality therapy is practiced in a different manner. At this institution, girls meet weekly in cottage groups to discuss their problems. A special preparole group has been constituted to discuss problems associated with the re-entry of girls into the community upon their release from the school. A point system is employed whereby a girl may move from one privilege level to another. Girls are classified as one of three personality types, according to a modified Quay system, and their cottage place-

ments are determined by their respective classifications.

Although group therapy is an important treatment modality in juvenile treatment programs, no therapy or discussion groups were employed for juveniles as late as 1973 at Gainesville and Crockett. Two caseworkers at Gainesville were conducting therapy groups at the time of trial, but many of the girls did not belong to any such group. A Gainesville employee testified that Gainesville relies on a "structured environment" to treat and rehabilitate girls. A privilege level exists at Gainesville. Girls are assigned to Group I when they enter the institution. For good behavior, girls may ascend to Group II, which carries with it the privileges of watching television more often and having occasional outings. For girls promoted to permitted. No group therapy meetings were operating at Gatesville until 1973.

Only a few boys at Mountain View belonged to any therapy group. The boys who did belong testified that they were precluded from discussing what they wanted to talk about and that these groups met only once a month, or less.

### C. *Conclusion*

The court has previously concluded that an institutionalized juvenile in Texas has a constitutional and statutory right to receive effective and adequate treatment. The court has found incarceration in the facilities of the Texas Youth Council to be violative of that right in many respects, including some aspects revealed to be critical to the task of rehabilitation only by the testimony of expert witnesses. Some of those findings are controversial. Yet the conclusion—that juveniles who are incarcerated for the express purpose of being "treated" professionally for their anti-social behavior have a right to receive such treatment—almost rises above controversy. Certainly the notion that the agents of the state should be permitted to exercise complete control over the lives of children by holding out the promise of treatment, and then brazenly

to claim that they are under no obligation to provide such treatment, mocks the Constitution. In Jackson v. Indiana, 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972), the Supreme Court stated: "At the very least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual [was] committed."

Considering this language of the Supreme Court, it seems beyond debate that the Texas Youth Council is constitutionally obliged to provide its wards with professional services designed to accomplish the stated objectives of its authority—the rehabilitation of delinquent children and their reintegration into society. As the preceding factual recital well demonstrates, the TYC has not offered such services in its institutions, with the exception of Brownwood or possibly Giddings. Whether by indifference or incompetence, it has placed hundreds of children in environments seemingly calculated to insure the failure of a competent treatment program, and it has offered a haphazard collection of so-called "treatment" services that no disinterested expert considered to be adequate. The evidence of the expert witnesses not connected with the TYC and who actually visited the institutions was unanimous: no coherent treatment program exists.

It is not sufficient for the defendants to contend that merely removing a child from his environment and placing him in a "structured" situation constitutes constitutionally adequate treatment. See Donaldson v. O'Connor, 493 F.2d 507, 511 (5th Cir. 1974) ("This was nothing more than keeping Donaldson in a sheltered hospital 'milieu' with other mental patients; the defendants did not refer to anything specific about the 'milieu' that was in any special way therapeutic."); see also Rouse v. Cameron, 125 U.S.App.D.C. 366, 373 F.2d 451, 456 (1966) (". . . it may not be assumed that confinement in a hospital is beneficial 'environmental therapy' for all."); Halpern, A Practicing Lawyer Views the Right to Treatment, 57 Geo. L.Rev. 782, 786–87 (1969). Nor do the TYC's sporadic attempts at "group therapy," "reality therapy" or "behavior modification" through the use of point systems rise to the dignity of professional treatment programs geared to individual juveniles. See Nelson v. Heyne, 355 F.Supp. 451, 459–460 (N.D.Ind. 1973), aff'd 491 F.2d 352 (7th Cir. 1974), cert. denied, 417 U.S. 976, 94 S. Ct. 3183, 41 L.Ed.2d 1146 (1974).

The task of actually providing appropriate treatment to delinquent juveniles is not easy, but neither is it impossible. Dr. Jerome Miller, formerly Commissioner of Youth Services for the State of Massachusetts, testified that Massachusetts has undergone a successful transition from a predominantly institution-based system of services for delinquents to an almost entirely community-based network of facilities. In the process, the directors of the agency discovered that far fewer children than expected actually required institutional care. Since the transfer of the vast majority of institutionalized juveniles to less confining programs freed large amounts of funds, those few juveniles who remain in intensive care institutions have been "surrounded" by staff. In fact, Dr. Miller estimated that the staff-inmate ratio at the institutions that remain in Massachusetts is one to one *or higher*.

In connection with this court's conclusion that juveniles in the custody of the Texas Youth Council are entitled to professional care and rehabilitative treatment designed to reintegrate them into society, it is found that the elements of a minimally adequate professional program are several:

1. Child care workers must be employed in numbers that are consistent with *individual* attention to every juvenile. These workers, whether designated "houseparents," "youth activity supervisors," "matrons," or "correctional officers," must be persons with at least high school educations. They should reflect a diversity of ages, sexes, and ethnic origins. They must have been tested for psychological fitness for their positions.

2. Every employee should receive both pre-employment and in-service training that is appropriate to his responsibilities.

3. Caseworkers must be employed in numbers adequate to provide personalized care to each juvenile, as well as to furnish competent supervision for all staff members who have contact with juveniles. Caseworkers should have, as a minimum requirement, Bachelor's degrees in social work, sociology, psychology, or a closely related field. Each caseworker should be closely supervised by a casework supervisor with the minimum qualification of a Master of Social Work degree or its equivalent. The casework staff should reflect diversity with respect to age, sex, and ethnic origin. Record-keeping must conform to professional standards.

4. Family involvement in therapy is essential to the rehabilitation of any juvenile who will return to his family upon release. This involvement should include opportunities for frequent home visits by the juvenile and even more frequent visitation by the family. The staff, particularly the casework staff, should include family therapy in the treatment of a juvenile who will return to his family. Visits with and by friends should also be used as therapeutic tools.

5. Each juvenile has a right to the implementation of a cohesive treatment strategy that has been professionally designed to suit his individual needs and achieve his rehabilitation and return to the community. In this connection, it is essential that those juveniles who are most emotionally disturbed or who manifest the most pronounced anti-social attitudes and behavior be the recipients of intensive treatment. For this purpose, the ratio of psychiatrists, psychologists, caseworkers, and attendant personnel to the juveniles to be accorded intensive treatment must be greatly enhanced.

In this area, as in others, the parties are directed to confer and attempt to agree upon a plan for delivering constitutionally and professionally adequate casework and child care treatment to juveniles under the authority of the Texas Youth Council. The court will not rule in the first instance on the details of such a plan, but will make rulings with respect to standards on which the parties are unable to agree. It is reiterated that all juveniles in the TYC system are constitutionally entitled to care that at *least* conforms to minimal professional standards.

## XIV. NEED FOR MONITOR

Throughout the trial of this case, witnesses, both juvenile and expert, stressed that children who feel that they have been abused, neglected or mistreated in a TYC institution have no recourse within the institution. Furthermore, there was much evidence to the effect that the TYC is such a geographically enormous and diverse jurisdiction that often "the left hand knoweth not what the right hand is doing"—hence, recommendations from the Reception Center are ignored at the residential schools, and directions from the Central Office are often unknown to on-line staff. In its emergency interim order, this court appointed Mr. Charles Derrick, who enjoyed the confidence of all parties, as ombudsman for the institution of Mountain View. Mr. Derrick's assistance has been invaluable to the court during the difficult period that has followed the entry of the interim order. The court expects that the rather fundamental changes that must take place in order to make the Texas Youth Council's facilities conform to constitutional and statutory mandates will be accompanied by even more difficulties. It will be necessary that all juveniles in TYC custody, and not only those confined in Mountain View, have access to an independent and disinterested person, who can hear their grievances and communicate directly with the court in the exercise of his judgment. It may be that one individual cannot perform this function for all TYC juveniles, since they live throughout the state; perhaps an entire staff of monitors will be required.

The parties are directed to confer with respect to a plan for a statewide monitoring system for TYC, to be responsible directly to the court. The functions of such a system should include investigation and attempted resolution of complaints by juveniles and staff; reporting to the court any matters thought to be appropriate by the monitor, including, but not limited to, possible violations of the court's order; advising TYC staff of its information, in the discretion of the monitor; and communicating with counsel for the various parties to this lawsuit, in the discretion of the monitor. The monitor or monitors should have free access to information about all TYC functions and be free to attend any meetings of TYC personnel.

The court contemplates the appointment of Mr. Derrick as monitor or chief monitor, as the case may be, providing that he is willing to accept the appointment. It is also contemplated by the court that the monitor be compensated by the TYC at a rate of pay commensurate with that of a deputy director of the TYC.

## XV. EMERGENCY INTERIM ORDER OF AUGUST 31, 1973

The defendants have moved the court to amend its Emergency Interim Relief Order of August 31, 1973, in certain respects. The other parties have responded to the defendants' motion, indicating agreement with some of their requests and various degrees of objection to others. The court believes that the subject matter of most of the motions may be disposed of by agreement of the parties, and therefore directs that they confer with the object of reducing their areas of disagreement. The result of their conference shall be reported to the court.

## XVI. INSTITUTIONAL CONFINEMENT

Plaintiffs and *amici* representing certain professional groups concerned with the care of children have proposed that the court, as part of its final order,

mandate the closing of all large rural institutions for delinquents in the State of Texas. They base their argument, in part, on the history of brutality and repression at some of the existing institutions and also on the constitutional principle that government must always seek to accomplish its ends in the manner that is least inimical to the liberty of those whom its affects. *See* Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

The court finds from the heavy preponderance of the evidence that two institutions, Gatesville State School for Boys and Mountain View State School for Boys, are places where the delivery of effective rehabilitative treatment is impossible, and that they must not be utilized any longer than is absolutely necessary as facilities for delinquent juveniles. The court is mindful of the drastic nature of a pronouncement that any physical facility is unfit simply because of its history; but the pages of testimony by expert witnesses in the record of this case, affirming the near-impossibility of eradicating brutality and indifference in locations where they have secured so firm a foothold, have convinced the court—against its own misgivings—that no relief short of complete abandonment of those institutions can insure that the mistreatment of juveniles is halted. The testimony of Howard Ohmart, a distinguished expert in the field of penology, was especially impressive:

It is my observation and some fairly close-up observations of a couple of these efforts to make significant reforms in these institutions that you are inevitably plagued with a lot of problems. The traditions once established seem to pervade the very walls of the place and resist being rooted out.

The *uncontradicted* testimony of children who had been confined at Gatesville and Mountain View, as well as the observations of the experts who visited those institutions, revealed a bizarre subculture that holds both inmates and

staff in its sway. A special language or vocabulary is used—"fresh fish," "peels," "tights," "on crumb," "hooked up," "racking." Rituals and codes of conduct are in existence which are as grim as the Sicilian *omerta*—all imposed on children, some of whom are no older than twelve. The staff is obsessed with the need for "control," as evidenced not only by the testimony of boys but also by the recollections of former employees and by the very materials prepared for distribution to new employees. Boys are frequently brutally punished for expressing disrespect for correctional officers or teachers. Yet some inmates practice extortion, assault, rape, and various forms of violence on other boys, frequently with little interference from personnel. Worse, the correctional officers single out certain inmates as "office boys"; these inmates act both as informers and as "enforcers," using threats and violence on other inmates at the direction or with the encouragement of the officers.

Ohmart testified that he had visited Mountain View only a few days after having spent a week at the Angola Prison in Louisiana, which has been characterized as "the worst prison in America." He concluded, in comparing the two institutions, that he saw "less tension, less rigidity, less regimentation at Angola than I did at Mountain View," and stated that he could only describe Mountain View as an "evil place." Mr. Ohmart's testimony was all the more impressive because he praised certain aspects of the Texas Youth Council's program, particularly its facility at Giddings. Dr. Jerome Miller, also of unquestionable expertise, testified that even a drastic improvement in the staff-student ratio at Mountain View, employing one caseworker for every five children, could not overcome the hostility to humane treatment that is a part of the institution's traditions.

The court believes the testimony of Dr. Miller and Mr. Ohmart. If ever confinement in an institution constituted a form of cruel and unusual punishment, Gatesville and Mountain View fully meet the applicable criteria. Although this finding by the court is extraordinary, it is not unprecedented. Courts have in the past found that certain facilities were incapable of being used for humane treatment, and that confinement in them constituted punishment of a kind forbidden by the Constitution. *See, e. g.*, Martarella v. Kelley, 349 F. Supp. 575 (S.D.N.Y.1972); Inmates v. Affleck, 346 F.Supp. 1354 (D.R.I.1972). In Inmates of Suffolk County Jail v. Eisenstadt, 360 F.Supp. 676 (D.Mass. 1973), Judge Garrity found, as a matter of law, that incarceration in the Suffolk County Jail constituted cruel and unusual punishment, and concluded further that no reforms or renovations could render it a constitutional facility. This court has reached the identical conclusion with respect to Mountain View and Gatesville. Measured by the "evolving standards of decency that mark the progress of a maturing society," Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958), the confinement of juveniles in a facility that compares unfavorably with one of the most notorious prisons in America is shocking and senseless. In addition to violating their inmates' eighth amendment rights, Gatesville and Mountain View prevent the provision of any meaningful treatment and thus violate the right to treatment as well. The court finds specifically that no reforms or alterations can rescue these institutions from their historical excesses.

Although the court does not find that incarceration in the remaining TYC institutions is cruel and unusual *per se*, it does find that the continued incarceration of juveniles in large, rural institutions raises serious constitutional questions. Many expert witnesses testified that professional consensus in the field of juvenile corrections holds that institutionalization is greatly overused and harmful to many, if not most, of its subjects. Excerpts from some of that testimony reveal substantial agreement:

It is my own experience and my own feeling that it is impossible to sustain a rehabilitative treatment over

an extended period of time in large institutional settings. (Dr. Jerome Miller)

The kinds of adjustments one makes to an institutional setting very often are almost the opposite of the adjustment he will have to make on the street or to the area in which he lives, and there is some research I am aware of . . . that shows in isolated custodially-oriented institutions that the more adjusted the inmate is to the institution and the more of a model inmate he is, the less likely he is to make it on the street . . . so that isolated institutions often construct unreal worlds that are very real to the needs of the institution but are very unreal to the needs of a person functioning in our society. (Dr. Miller)

It's all over the country that we have learned that institutions who are mass, which I mean goes beyond the thirty to forty figure, and who are outlying are harmful. (Dr. Gisela Konopka)

It's such a large institution that even the simplest kind of communication gets distorted before it gets all around the different program areas, and it is impossible to have all the different people involved in at one time so that you can present any kind of consistent, coherent message. (Dr. Patricia Blakeney)

. . . it is the nature of that large institution with its history and philosophy that makes it impossible for one person to come in and start something and change the rest of the institution. (Dr. Blakeney)

The staff is a part of that system, as well as the children, and they all fit together to form the system of the institution, and it is run in order to keep the institution running smoothly, not to meet the needs of the children, but to meet the needs of the institution itself. (Dr. Blakeney)

I would say that institutionalization, the placing of children or adults on closed treatment settings, is like an operation. It's never healthy to cut someone open. Sometimes you don't have an alternative and you have to pursue that line, but it represents a difficulty that you have to struggle with or struggle against. (Dr. Alvin Burstein)

The National Advisory Commission on Criminal Justice Standards and Goals, in its report, *Corrections,* concludes unequivocally that institutionalization of juveniles is destructive and must stop. The Commission recommends:

. . . existing institutions for juveniles should be closed. The primary purpose to be served in dealing with juveniles is their rehabilitation and reintegration, a purpose which cannot be served satisfactorily by state institutions. In fact, commitment to a major institution is more likely to confirm juveniles in delinquent and criminal patterns of behavior.

*Corrections* at 358.

Large institutions oppress their residents by virtually forcing the staff to ignore the individual needs of each child. For example, the cruel practice of latching girls in their rooms during long hours of the afternoon and evening at Gainesville is thought to be necessary by the staff because some of the girls require confinement, and for the reason that the staff wishes to treat all of the girls alike. Thus, scores of girls are subject to a severe deprivation merely because it may be appropriate for a few. The Chief of Casework Services at Mountain View, a witness for the defendants, described the situation at a large institution eloquently. Defending the practice of putting a boy in solitary confinement as punishment for refusing to work or refusing to do exercises, he explained:

You would again have to do something with him if he refused to do exercises. There again, I feel that if he didn't, then you could create a problem where the other boys would

be acting up, too, so I think something would need to be, some type of discipline. . . . some 400 boys you would have; if you don't have control for them, I expect every one of them might want to walk off a job.

Texas institutions suffer from many other handicaps, which collectively constitute an almost insuperable bar to their effectiveness as centers for rehabilitation. Their locations, in small rural towns far from urban population centers, make family involvement in the juvenile's life utterly impossible for most of their inmates. The staff members of the institutions, particularly the nonprofessional staff, are usually Anglo, provincial, local residents; often they have no understanding whatever of the urban, tension-filled lives from which most of the institutions' inmates have been torn. Highly skilled professional staff such as psychiatrists, special education teachers, psychologists, caseworkers, physicians, and minority staff members can scarcely be lured to the outlying locations where the institutions are situated. Moreover, there is no possibility of using community resources such as universities, clinics, and specialized medical services in the small rural towns where TYC institutions are located; those services simply do not exist in such towns, with few exceptions. The use of furlough and gradual transition from institutional residence back to a permanent living place is not practicable in those institutions; the closest that they come to providing a supervised transition is sending a child home for a weekend once or twice before final parole or release. Thus, the child is frequently disoriented by a sudden change from close confinement to almost absolute freedom, with little guidance to ease the transition. The inaccessibility of the institutions also contributes to the ineffectiveness of the vocational education programs; there are few large employers in the towns, and the institutions cannot maintain significant contacts with employers elsewhere in the state. Therefore, the training that children receive often has little or no relationship to the current employment market.

Again, the court does not find that the institutionalization of a juvenile is unconstitutional *per se*. It does find that the institutions of the Texas Youth Council, with their special qualities and attributes, are on the whole incapable of fulfilling the constitutional requirement that each institutionalized juvenile receive rehabilitative treatment. *See generally* White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) (multi-member legislative districts are not *per se* unconstitutional, but may be impermissible in light of size, history, and other factors).

Another compelling consideration demonstrates that the Texas Youth Council cannot constitutionally continue to incarcerate all or almost all of the children committed to its care. An important incident of the right to treatment is the right of each individual to the least restrictive alternative treatment that is consistent with the purpose of his custody. *See* Covington v. Harris, 136 U.S.App.D.C. 35, 419 F.2d 617 (1969); Lake v. Cameron, 124 U.S.App. D.C. 264, 364 F.2d 657 (1967); Rouse v. Cameron, 125 U.S.App.D.C. 366, 373 F. 2d 451, 453–455 (1966); Lessard v. Schmidt, 349 F.Supp. 1078 (E.D.Wis. 1972); Wyatt v. Stickney, 344 F.Supp. 387, 396 (M.D.Ala.1972).

This principle, as it relates to an institutionalized juvenile's right to be free from unnecessary and arbitrary restrictions placed on his freedom of movement, speech, and privacy, has already been discussed. Yet the principle has another, perhaps more significant corollary.

Just as the state cannot mechanically hospitalize every person found to be mentally ill, *see Lake, supra,* it may not institutionalize every child that the state's courts declare to be a delinquent. Yet the testimony at trial established that the Texas Youth Council seldom, if

ever, places a child committed to its care in any situation except a TYC institution. Moreover, testimony of expert witnesses at the trial was practically unanimous that not all of the children committed to TYC custody need institutionalization. Estimates of the number who did require care in a secure residential facility ranged from ten per cent to fifty per cent. The TYC has explicit statutory authority for using community-based programs to effect the treatment of children committed to its care, see Tex.Rev.Civ.Stat.Ann. art. 5143d, Sec. 17 (1971), but has chosen to ignore that grant of authority and pursue institutionalization as its sole alternative. This choice is not permissible under the Constitution.

Most previous cases concerning the right to the least restrictive alternative treatment have required that the authority to which an individual is committed evaluate that individual's needs and select a treatment program that is as conducive as possible to the individual's freedom. *See, e. g.,* Lessard v. Schmidt, 349 F.Supp. 1078, 1096 (E.D.Wis.1972) ("We believe that the person recommending full-time involuntary hospitalization must bear the burden of proving (1) what alternatives are available; (2) what alternatives were investigated; and (3) why the investigated alternatives were not deemed suitable."). But this procedure is hollow if there are, in fact, no alternatives to institutionalization. The state may not circumvent the Constitution by simply refusing to create any alternatives to incarceration; it must act affirmatively to foster such alternatives as now exist only in rudimentary form (foster homes, supervised probation and parole), and to build new programs suited to the needs of the hundreds of its children that do not need institutional care (*e. g., group homes,* halfway houses, day care programs, outpatient clinics, home placements with close supervision). The Constitution of the United States and the laws of the State of Texas require no less of the defendants. *See* Developments in the Law

—Civil Commitment of the Mentally Ill, 87 Harv.L.Rev. 1190, 1252 (1974) (". . . one might rely on decisions in other areas ordering the creation of alternatives and cases finding that 'inadequate resources can never be an adequate justification for depriving any person of his constitutional rights' to argue that the least restrictive alternative doctrine requires the development of a broad range of mental health treatment facilities.") (footnotes omitted); Chambers, Alternatives to the Civil Commitment of the Mentally Ill, 70 Mich.L.Rev. 1107 (1972); *see generally* United States v. Alsbrook, 336 F.Supp. 973 (D.D.C.1971).

The record of this case is replete with the advice of persons who have experience with the creation of a range of community-based services for youth. The defendants thus need not feel that they are faced with an insurmountable task. Nor does the court intend to dictate to the defendants exactly how they shall accomplish the goal of decentralization; the court directs that the parties confer and seek to prepare a plan for the implementation of that purpose.

In summary, Gatesville and Mountain View must be abandoned as quickly as possible. The court will consider the consensus of the parties as to how soon this may be accomplished. Within a reasonable period, making allowance for careful planning but not for foot-dragging, the defendants must cease to institutionalize any juveniles except those who are found by a responsible professional assessment to be unsuited for any less restrictive, alternative form of rehabilitative treatment. Additionally, the defendants must within the same period create or discover a system of community-based treatment alternatives adequate to serve the needs of those juveniles for whom the institution is not appropriate. Those juveniles for whom close institutional confinement is necessary must *actually* be treated. They may not be abandoned as hopeless and simply warehoused until they grow too old for juvenile facilities. In particular, those *few*

juveniles for whom close confinement is appropriate must be surrounded by a staff trained to meet their special needs, in a virtually one-to-one ratio. In this era, when it is common for teams of medical personnel and allied specialists and technicians closely to monitor critically ill patients in intensive care units in hospitals, it is not too much to expect that children whose entire lives may be blighted if they do not receive adequate treatment and help should be the objects of individual attention. It would be ironic indeed if the law may require that every juvenile prior to incarceration be aided by a lawyer devoted to the fierce protection of his individual rights, yet may consign the child *after* incarceration to the status of a cipher, lost among hundreds of other children.

## XVII. SUBMISSION OF PLANS

The court will not, in the first instance, issue any injunctive relief in this case, although the court's Emergency Interim Order will remain in effect pending further order of the court. All of the participants in this civil action—plaintiffs, defendants, the United States, and *amici*—are directed to confer within thirty days of the entry of this memorandum opinion, for the purpose of drafting a detailed plan for accomplishing a network of facilities for the treatment of delinquent youth that is consistent with this opinion. No party shall waive any objection or right of appeal by its participation.

It is the desire of the court that the plan be written by experts—persons with special skill and knowledge of the nature of and problems connected with the field of juvenile corrections.

Accordingly, the court directs that the parties designate representatives to attend the drafting sessions as follows: the plaintiffs shall be entitled to one attorney and one expert, the United States to one attorney and one expert, the remaining *amici* to one attorney and one expert, and the defendants to two attorneys and three experts. No other individuals shall participate in the drafting at any one time, except by unanimous consent. (A party's representatives need not always be the same, so long as it has no more than the assigned number participating at any given time.) By "experts," the court means persons who hold either a Master's degree or a Doctorate in social work or a related field, a Doctorate in psychology, or a medical degree together with a Board-certification in psychiatry.

The court is confident that the parties, with the assistance of experts, will be able to agree on many, if not all, of the standards for a coordinated system of youth corrections consistent with this opinion. If the parties are unable to agree unanimously upon a certain standard, those who are able to agree should do so, and those who dissent should submit separately the standard that they propose, together with a brief summary of their reasons for doing so. If necessary, the court will rule between competing standards submitted by the parties. The court will then order the implementation of a plan comprising all of the standards agreed upon by the parties together with such other standards as it may choose from among competing submissions as most consistent with the requirements of law.

It is scarcely necessary to add that the court is confident that all of the parties will enter into these negotiations with the spirit of utmost good faith and accommodation. Attorney General John Hill, during his brief appearance at the trial of this case, spoke stirringly of how very difficult is the problem of caring for troubled youth, but expressed his evident belief that "every person in the sound of my voice and in this courtroom is dedicated . . . to trying to have the most enlightened and progressive approach to that problem." The court shares his belief, and trusts that the parties, sharing a common goal, will find a common solution.